# YOUNGDAHL ET AL. *v.* RAINFAIR, INC.

No. 11.  Argued October 15, 1957.—Decided December 9, 1957.

*William J. Isaacson* argued the cause for petitioners. With him on the brief were *Sidney S. McMath, Leland F. Leatherman* and *Henry Woods.*

*J. L. Shaver, Sr.* argued the cause and filed a brief for respondent.

MR. JUSTICE BURTON delivered the opinion of the Court.

The issues here are whether, under the circumstances of this case, a state court may enjoin strikers and union representatives from (1) "threatening, intimidating or coercing any of the officers, agents or employees of [the employer] at any place," and also "from obstructing, or attempting to obstruct the free use of the streets adjacent to [the employer's] place of business, and the free ingress and egress to and from [the employer's] property," and (2) all "picketing or patrolling" of the employer's premises. For reasons hereafter stated, we conclude that the state court may lawfully·enjoin conduct of substantially the first category but not of the second.

Most of the material facts are uncontroverted. In 1955, respondent, Rainfair, Inc., was a Wisconsin corporation with headquarters in Racine, Wisconsin. It owned and operated a plant in Wynne, Arkansas, an essentially rural community of about 4,000 inhabitants. About 100 women and seven men were there employed in the manufacture of men's slacks which were shipped in interstate commerce. None of the employees were members of a labor union but many had signed applications to join the Amalgamated Clothing Workers of America, CIO, which is one of the petitioners.

Apparently in an effort to compel the employer to recognize the union as the bargaining agent of the employees, 29 of the employees did not report for work on May 2, 1955. A picket line was established on the street in front of the plant. Strike headquarters were

maintained across the street from the plant entrance. Nearly all of the strikers were women. Their number varied from eight to 37. All was not quiet, however. On one occasion nails were strewn over the company's parking lot and, about a week later, the whole lot was "seeded" with roofing tacks. Tacks were also scattered in the driveway of the plant manager's home and on the driveways of 12 of the nonstriking women employees. One of the pickets told the plant manager that she would "wipe the sidewalk" with him and send him back to Wisconsin because he "was nothing but trash." The plant manager was followed by the strikers each time he left the plant; he also was harassed at night by occasional shouting at his home and by numerous anonymous telephone calls.

Immediately after the strike was called, respondent, by registered mail, informed each of the strikers that, if they did not return to work within a few days, the company would assume that those not returning had quit their jobs. Only three returned. Thirteen new employees were hired. The strike ended on May 19, the pickets were withdrawn and the strikers applied for reinstatement. Respondent, however, declined to arrange for immediate reinstatement. On June 17, the strikers voted to re-establish the picket line on Monday, June 20.[1] The purpose was to protest against respondent's failure to recognize the union and its refusal to reinstate the employees who had applied for reinstatement in May.

---

[1] In the meantime the union had filed unfair labor practice charges against respondent before the National Labor Relations Board. These were still pending at the time of the hearing of the instant case. The union also requested the Board to conduct a representation election, but this request was withdrawn before the hearing on the injunction. At an election held on October 19, a majority of the employees of respondent voted not to be represented by the union.

Shortly after midnight, on the morning of June 20, two women strikers deliberately drove a sharp instrument into two tires of a car owned by the daughter of one of the nonstriking women employees.[2] At about 5:15 a. m. the police were summoned to the plant where they found a five-foot black snake inside the plant beneath a broken window. At about 6 a. m. picketing was resumed.[3] Although the union posted notices warning the strikers against committing acts of violence, a union representative later was sufficiently concerned to ask the police to have someone regularly on duty at the entrance to the plant. The evidence shows that the tension was in large part caused by the enormous amount of abusive language hurled by the strikers at the company employees. The Supreme Court of Arkansas later summarized this as follows:

> "As the employees would go to and from work at the plant, or go to lunch, or take a recess, the strikers would congregate along the west edge of their lot and sometimes in Rowena Street and engage in loud and offensive name calling, singing or shouting directed at the workers. They would call the workers 'scabs,' 'dirty scabs,' 'fat scabs,' 'yellow scabs,' 'crazy scabs,' 'cotton patch scabs,' 'pony tailed scabs,' 'fuzzy headed scabs,' 'fools,' 'cotton picking fools,' and other similar names. This took place every time an employee left or entered the plant. It was done by the strikers individually, in couples or by the entire group and in a loud and boisterous manner. One witness described it as 'just bedlam' when more than a dozen joined in the shouting. Particular

---

[2] They later were convicted of this misdemeanor.

[3] The placards were inscribed, "Rainfair Workers on Strike, Rainfair is unfair to its employees, Amalgamated Clothing Workers of America, CIO."

names or remarks were reserved for individual workers. One pregnant worker was greeted with, 'Get the hot water ready,' or, 'I am coming to make another payment on the baby, call Dr. Beaton,' or, 'Why, you can work another hour until you go to the delivery room.' This worker and another drove to a filling station for gasoline when two of the strikers drove up and told the attendant not to wait on 'these scabs' before he waited on the strikers.

"One worker said the strikers always called her 'fat scab,' and that individual pickets and strikers made fun of her clothing and asked her if 'Pete,' the plant manager, still liked her 'low-cut dresses and earrings.' This made the employee so angry she invited the picket to come over and 'make it some of her business.' . . .

"The strikers sang songs with improvised lyrics to the tune of certain popular ballads and religious and Union songs. 'When The Saints Go Marching In' became 'When The Scabs Go Marching In' and the ballad, 'Davy Crockett,' began, 'Born in a cotton patch in Arkansas, the greenest gals we ever saw . . . .'

"The women pickets would stand in the street or sit near the plant and shout ugly names, stick out their tongues, hold their noses and make a variety of indecent gestures while pointing at the workers in the plant. Several workers testified the continuous name calling and boisterous conduct of the strikers made them afraid, angry, ill or nervous and had an adverse effect on their ability to properly do their work. Some of the workers would talk back to the strikers while others remained silent. The Chief of Police of Wynne testified there was more tension during the second picketing than the first and that he was fearful there was going to be trouble

during the second picketing and so informed Union staff members. One staff member called him once when trouble seemed imminent and wanted to 'go on record' as having requested the presence of the officer." 226 Ark. 80, 83–84, 288 S. W. 2d 589, 591.

On June 24, respondent filed a complaint in the local Chancery Court. It described the conduct of the strikers and alleged that such conduct amounted to "unlawful acts . . . for the unlawful purpose of intimidating and coercing" respondent's employees into joining the union, that respondent had no adequate remedy at law and that it was suffering irreparable damage from such conduct. The court acted upon the complaint and the testimony of the plant manager and issued a temporary injunction. After full hearing, it made the injunction permanent on September 15. The trial court's findings included the following statement:

> "That the defendants, in picketing the plaintiff's plant, have resorted to violence, coercion and intimidation, and such other unlawful conduct as was calculated to cause a breach of the peace, and that the defendants have unlawfully abused the right to peaceably picket, as granted to them by the laws of this state and the Federal Constitution, and that said defendants should be permanently enjoined from picketing the plaintiff's plant."

The permanent decree enjoined not only the threatening and intimidation of the employees of respondent at any place, but also all picketing or patrolling of respondent's premises by the named defendants and all other persons in sympathy or acting in concert with them.[4] The

---

[4] "It is, therefore, considered and decreed by this court that the defendants James E. Youngdahl . . . and each of them, and their agents and employees, and each and every one of the officers and

Supreme Court of Arkansas affirmed the decree. 226 Ark. 80, 288 S. W. 2d 589. We granted certiorari largely because of the sweeping language of the decree. 352 U. S. 822.

The applicable principles of law are substantially agreed upon. Respondent concedes that it is engaged in interstate commerce and that its employees are entitled to the protection of the National Labor Relations Act, as amended, 61 Stat. 136, 29 U. S. C. § 151. Respondent does not contend that the state court had power to enjoin peaceful organized activity, recognizing that generally the

members of Amalgamated Clothing Workers of America, CIO, and all other persons in sympathy, or acting in concert with them, be, and they are hereby permanently enjoined while on, adjacent to, or near plaintiff's premises located on Martin Drive and Rowena Street, in Wynne, Arkansas, from interfering with plaintiff's business, its customers and employees, and from picketing or patrolling, or causing to be picketed or patrolled the plaintiff's premises, and the sidewalks, streets, or other property adjacent to plaintiff's premises, with placards or banners designating said place of business as unfair to organized labor, or with placards otherwise so worded as to give said place of business such designation; that the defendants, and each of them, their agents and employees, and the officers and members of the above-mentioned union, and all sympathizers, and all other persons acting in concert with them, be, and they are hereby restrained and enjoined from accosting and detaining, or causing to be accosted or to be detained on the sidewalks or streets adjacent to or on plaintiff's premises, any person or persons seeking to enter or depart from said place of business for the purpose of dissuading them from patronizing, or working for plaintiff, or from calling attention to any alleged unfairness of plaintiff, or its place of business, to organized labor; from threatening, intimidating or coercing any of the officers, agents or employees of plaintiff at any place; from loitering and congregating around and under the tent and upon the property that is used as the union's headquarters, located directly across Rowena Street in front of plaintiff's premises; and from obstructing, or attempting to obstruct the free use of the streets adjacent to plaintiff's place of business, and the free ingress and egress to and from plaintiff's property."

National Labor Relations Board has exclusive jurisdiction of such matters. *Weber* v. *Anheuser-Busch, Inc.,* 348 U. S. 468. Petitioners concede that the state court had the power to enjoin violence. *Auto Workers* v. *Wisconsin Board,* 351 U. S. 266; *Allen-Bradley Local* v. *Wisconsin Board,* 315 U. S. 740. Respondent contends that the record here shows a pattern of violence so enmeshed in the picketing that, to restore order, it was necessary to enjoin all organized conduct. Petitioners, on the other hand, urge that there was no violence here and no threat of it and, accordingly, that there was no factual warrant for the injunction which issued.

The issue here is whether or not the conduct and language of the strikers were likely to cause physical violence. Petitioners urge that all of this abusive language was protected and that they could not, therefore, be enjoined from using it. We cannot agree. Words can readily be so coupled with conduct as to provoke violence. See *Chaplinsky* v. *New Hampshire,* 315 U. S. 568, 571–572. Petitioners contend that the words used, principally "scab" and variations thereon, are within a protected terminology. But if a sufficient number yell any word sufficiently loudly showing an intent to ridicule, insult or annoy, no matter how innocuous the dictionary definition of that word, the effect may cease to be persuasion and become intimidation and incitement to violence.[5] Wynne is not an industrial metropolis. When, in a small community, more than 30 people get together and act as they did here, and heap abuse on their neighbors and

---

[5] In Arkansas there was then in effect a statute of long standing which expressly made it a crime for any person to "make use of any profane, violent, vulgar, abusive or insulting language toward or about any other person in his presence or hearing, which language in its common acceptation is calculated to arouse to anger the person about or to whom it is spoken or addressed, or to cause a breach of the peace or an assault . . . ." Ark. Stat., 1947, 41–1412.

former friends, a court is justified in finding that violence is imminent. Recognizing that the trial court was in a better position than we can be to assess the local situation, we think the evidence supports its conclusion, affirmed by the State Supreme Court, that the conduct and massed name-calling by petitioners were calculated to provoke violence and were likely to do so unless promptly restrained.

Though the state court was within its discretionary power in enjoining future acts of violence, intimidation and threats of violence by the strikers and the union, yet it is equally clear that such court entered the pre-empted domain of the National Labor Relations Board insofar as it enjoined peaceful picketing by petitioners. The picketing proper, as contrasted with the activities around the headquarters, was peaceful. There was little, if any, conduct designed to exclude those who desired to return to work. Nor can we say that a pattern of violence was established which would inevitably reappear in the event picketing were later resumed. Cf. *Milk Wagon Drivers Union* v. *Meadowmoor Dairies, Inc.,* 312 U. S. 287. What violence there was was scattered in time and much of it was unconnected with the picketing. There is nothing in the record to indicate that an injunction against such conduct would be ineffective if picketing were resumed.

Accordingly, insofar as the injunction before us prohibits petitioners and others cooperating with them from threatening violence against, or provoking violence on the part of, any of the officers, agents or employees of respondent and prohibits them from obstructing or attempting to obstruct the free use of the streets adjacent to respondent's place of business, and the free ingress and egress to and from that property, it is affirmed. On the other hand, to the extent the injunction prohibits all other picketing and patrolling of respondent's premises and in

particular prohibits peaceful picketing, it is set aside. The judgment of the Supreme Court of Arkansas is vacated and the case is remanded to it for further proceedings not inconsistent with this opinion.

*It is so ordered.*

THE CHIEF JUSTICE, MR. JUSTICE BLACK, and MR. JUSTICE DOUGLAS, being of opinion that Congress has given the National Labor Relations Board exclusive jurisdiction of this controversy, would reverse the judgment in its entirety and remand the cause to the state court for dismissal of the injunction.