**WESTINGHOUSE BROADCASTING COMPANY, INC., Plaintiff,**

v.

**Michael S. DUKAKIS et al., Defendants.**

**Civ. A. No. 76–930–S.**

United States District Court,
D. Massachusetts.

May 12, 1976.

See also D.C., 409 F.Supp. 895.

Robert J. Glass, Nutter, McClennen & Fish, Boston, Mass., for plaintiff.

Joseph G. Sandulli, Angoff, Goldman, Manning, Pyle & Wanger, Boston, Mass., for defendants.

## MEMORANDUM AND ORDER ON MOTION FOR PRELIMINARY INJUNCTION

SKINNER, District Judge.

The plaintiff brings this motion against the individuals named in their Amended Complaint and Local 1228 of the Interna-

tional Brotherhood of Electrical Workers, seeking to enjoin those defendants from interfering with the plaintiff's cameramen. The issue is whether the testimony adduced by the plaintiff warrants findings which meet the standards of the Norris-LaGuardia Act, 29 U.S.C. §§ 101–108 and Fed.R.Civ.P. 65.

## FINDINGS OF FACT

The plaintiff is the owner and operator of a chain of radio and television stations, including WBZ radio and WBZ–TV (Channel 4) in Boston ("WBZ"). The defendants are news cameramen and technicians formerly employed by WBZ and their local union of the IBEW ("the union"). News cameramen and technicians employed by Channel 5 and Channel 7 in Boston are also members of the same local union. The plaintiff and the defendants were for many months engaged in collective bargaining for the purpose of negotiating a labor contract to replace that which expired in October of 1975. I find that both parties have bargained in good faith to settle their dispute and have availed themselves of all available governmental machinery of mediation and voluntary arbitration. The negotiation has reached an impasse and there have been no further collective bargaining attempts since mid-March of 1976. The issues are as follows:

1. Whether the editing of radio tape can be done by persons who are not members of the union.
2. Whether public affairs cameramen who use electronic mini-cameras must be members of the union.
3. Whether the news cameramen and technicians are to consist of a single bargaining unit or separate bargaining units.
4. Whether various smaller pieces of equipment may be used without union personnel; e. g., an unmanned amplifier.

At some point in early March, the plaintiff determined to lock out the individual defendants and the other news cameramen and technicians who are members of the union.

I find that there is a continuing labor dispute existing between the plaintiff and the defendants within the meaning of the Norris-LaGuardia Act, 29 U.S.C. § 101ff.

Thereafter, the plaintiff brought in junior production personnel from its other stations to be used as news cameramen and technicians. These people are not union members and are referred to by the defendants, in accordance with immemorial tradition, as "scabs."

The defendants are engaged in peaceful picketing of the WBZ headquarters in Brighton. Members of the union who formerly were employed by WBZ are required by the union to spend twenty hours per week on the picket line.

In addition, the individual defendants have engaged in the practice of following the WBZ "scab" news cameramen to the sites of newsworthy events and interposing various objects between the camera lens and the subject being photographed. Videotapes of this activity were admitted in evidence and a representative sample of them viewed by the Court. Reports of these activities and their success are carried in a "Lockout Newsletter" which I find to have been produced by or under the auspices of the union.

According to the videotapes, many of these events took place in the presence of police officers of every rank, from Commissioner to patrolman. The police made no effort to stop the activities of the defendants.

Union members are given credit against the required twenty hours of picketing time for time spent on the above described blocking of the WBZ news cameras.

On occasion, also, the defendants have used their automobiles to interfere with the travel of WBZ cameramen to the site to be photographed. One of these occasions was reported in the "Lockout Newsletter" as follows:

## A DAY IN THE LIFE OF A SUPER SCAB CHASER

Our ever alert super scab chasers picked up a photographer and Publicov-

er's ace driver at the station at 8:00 a. m. They followed them to Turnstyle and blocked their car in before Ace knew he was even being tailed. Our S.S.C's could not move their car because of alleged car trouble. 30 min. later, after mini-negotiation our S.S.C's moved their car. Later, at a rotary between Interstate 95 & Route 1 Northbound, the two cars met up again. Publicover's Ace hugged the inside rail and our S.S.C's rode his right flank, leaving him no way out. After 25 laps, Ace was still in first place, but was still lacking an exit. Sometime later, negotiations were held again on Ustis Street, in Saugus. Ustis Street is a dead end, and this time our S.S.C's had blocked the only exit. At this point, several interviews were held with local neighbors. All but one refused to get involved. The one who did dec[ided] to handle the situation with the toss of a coin, provided to him by one of the good guys. The agreement was, heads the company got to use the phone and tails, the union. The union won the toss and decided to let the company sit on Ustis Street a while longer to deliberate their dilemma. At this point, the photographer decided to call the station on his trusty two-way radio. Unfortunately. for him—justice prevailed and transmission was impossible, so there they sat. Some five and a half hours and 120 miles later, they returned to the station having never shot one frame of film.

The testimony of Richard Wagenheim, the WBZ photographer involved, was that the report was accurate except that there were five circumnavigations of the rotary rather than the twenty-five reported.

The defendants assert that their interference with the cameramen is a mere extension of peaceful picketing, designed to publicize the labor dispute and to carry their message to the "customers" of WBZ. Since the customers of WBZ do not come to the plant, they may only be reached on the TV screen. The defendants base this argument on the fact that the typical means of blocking the lenses of the WBZ camera is by placards which state in various forms of

words that WBZ employees have been locked out to "break the union."

I do not accept this characterization of the defendants' acts for the following reasons:

1. The use of placards so completely blocks the newsworthy events as to insure that the films will not be shown on the TV screen, and no publicity will result.

2. The placards are often placed sideways or so close to the camera as to be completely inside the minimum focal length of the lens. They appear as white blurs. This is inconsistent with any purpose of securing publicity.

3. On a number of occasions, appearing on the videotape, the lens was blocked by other objects or lights flashed into the lens.

4. The various events of interference are described by the defendants in the "Lockout Newsletter" in terms of their success in preventing the photographing of various important news events.

I find as a fact that the defendants, including the union, are engaged in deliberate and concerted action to harass the plaintiff in its attempt to videotape local news events for broadcast to the public. I further find that this harassment is for the purpose of forcing the plaintiff to settle the labor dispute, and as a reprisal for the lockout of the defendants and engagement of non-union cameramen and technicians.

I further find that the plaintiff has established by clear proof that the union has authorized and ratified the activities of the individual defendants by crediting the time spent harassing the WBZ cameramen against required picketing time and by reporting these events with approbation in its Newsletter. 29 U.S.C. § 106.

There has been little if any violence in connection with the defendants' activities, with the exception of the rotary incident above described. The defendants have

made conspicuous efforts to maintain cordial relationships with the plaintiff's cameramen.

I find that on some occasions, however, the colloquy between the defendants and the cameramen, audible on the videotape, indicates that the cameramen have been crowded into corners and harassed at such close range as to create a reasonable anxiety of physical harm to themselves or their equipment. I find that the defendants' use of their automobiles has been of the same character. I find that the defendants' conduct is in this respect impermissibly provocative and creates a likelihood of resulting physical violence.

I further find that the presentation of films of local news events is an important aspect of TV news broadcasting, and an area in which TV stations seek competitive advantage over other stations in the same area. Inability to provide such filmed presentations will adversely affect the plaintiff's delivery of service to the public and consequently its business.

## RULINGS OF LAW

The issuance of injunctions in labor disputes is governed by the terms of the Norris-LaGuardia Act, 29 U.S.C. §§ 101–115. No injunction shall be issued unless it is in strict conformity with this chapter and not contrary to the public policy declared in the chapter.

The mandatory prerequisites for the issuance of an injunction may be summarized as follows (29 U.S.C. § 107).

(a) Unlawful acts have been threatened and will be committed;

(b) Substantial and irreparable damage to complainant's property will follow;

(c) Denial of relief will inflict greater injury upon complainant than will be inflicted upon defendants by the granting of relief;

(d) Complainant has no adequate remedy at law;

(e) The police are unable or unwilling to furnish adequate protection.

The police are clearly unable or unwilling to protect the plaintiff from the defendants' activities, probably for the very adequate reason that what the defendants are doing is, for the most part, not criminal.

The plaintiff has no adequate remedy at law. The granting of relief will not injure the defendants, and the denial of relief will injure the plaintiff.

There are two questions which remain and constitute the principal issues in this case.

(1) Is the defendants' conduct unlawful?

(2) Does the defendants' conduct create a risk of substantial and irreparable injury to complainant's property?

"Unlawful" as used in the Norris-LaGuardia Act has been held to mean "criminal." *Brotherhood of Railroad Trainmen v. Central of Ga. Ry.*, 229 F.2d 901 (5th Cir. 1956). This definition originates in some very casual dictum in *Carter v. Herrin Motor Freight Lines, Inc.*, 131 F.2d 557 (5th Cir. 1942). On the other hand, mere "mischief for mischief's sake" unrelated to any proper labor purpose, but not of itself criminal, has been held "unlawful" within the meaning of 29 U.S.C. § 107(a). *Potomac Electric Power Co. v. Washington Chapter of Congress of Racial Equality*, 209 F.Supp. 559 (D.D.C.1962); 210 F.Supp. 418 (D.D.C. 1962).

Neither line of cases presents very compelling authority. Congress went to considerable pains to set out the policy of the Norris-LaGuardia Act in 29 U.S.C. § 102. Presumably, such broad words as "unlawful" were to be interpreted in the light of this policy. The problem is that while the policy of the act was responsive to the situation of workers in 1932, and represented a landmark in the history of the labor movement, it simply does not speak to the present condition of these parties.

The desire to remove labor controversy from the equity jurisdiction of district courts does nevertheless survive as a dominant purpose of the Norris-LaGuardia Act. See *Milk Wagon Drivers' Union v. Lake*

584

*Valley Co.*, 311 U.S. 91, 100–103, 61 S.Ct. 122, 126–28, 85 L.Ed. 63, 68–70 (1940). The policy is carried forward in the provisions of the National Labor Relations Act and the Labor Management Relations Act. The district court is by-passed in favor of the National Labor Relations Board and the Courts of Appeal.

█ The nub of jurisdiction left to the district court seems to be the preservation of the peace. Acts of violence, acts likely to cause violence, and verbal harassment of a non-violent but provocative nature may be enjoined. *E. g., Youngdahl v. Rainfair, Inc.*, 355 U.S. 131, 78 S.Ct. 206, 2 L.Ed.2d 151 (1957). (There was an applicable state statute in *Youngdahl* making the use of provocatively insulting language a crime, but the result in that case does not appear to depend on the statute.) Violation of 47 U.S.C. § 506, relied upon by plaintiff, while carrying criminal sanctions, would not be such acts as would justify the district court's intervention by injunction.

█ I am of the opinion that the jostling of the plaintiff's cameramen, the interference with them at very close range, and, in particular, the use of defendants' motor vehicles to interfere with their travel, constitutes a level of harassment and intimidation which not only warrants but requires this Court's intervention. These acts are unlawful and create a risk of substantial and irreparable harm to the plaintiff's property. I rule that jurisdiction of the subject matter is established, and that personal jurisdiction over the parties exists.

The incipiently violent aspects of the defendants' conduct constitute a critical but relatively small element in the relationship between the parties. The relief to be granted should be measured accordingly. The findings of fact which I have made require that the union, as well as the named individuals, be subject to the preliminary injunction.

I am of the opinion that the very limited permissible purpose of this Court's intervention, at least on the present record, would be served if the defendants and those participating with them are enjoined from placing themselves, their placards, or any other object within ten feet of the plaintiff's cameramen, and from shining lights into the camera lens, which serves no permissible purpose. They should be enjoined from using their motor vehicles to impede or endanger the travel of the plaintiff's cameramen, and should keep their vehicles at least fifty feet away from vehicles being used by plaintiff's cameramen in the pursuit of their assignments.

█ The purpose of this Order is to minimize the danger of physical injury and violent confrontation without infringing on the defendants' rights under 29 U.S.C. § 104(e), or the defendants' general right to bring economic pressure by any means that does not create the risk of violence. The plaintiff's remedy for unfair but non-violent action is by application to the National Labor Relations Board under 29 U.S.C. § 160.

An interlocutory decree will enter in accordance with the foregoing. So ordered.