**INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, AFL–CIO, et al.; Air Line Pilots Association International, et al., Defendants–Appellants,**

v.

**EASTERN AIR LINES, INC., Plaintiff–Appellee.**

**Nos. 90 Civ. 1204 (LBS), 90 Civ. 1205 (LBS) and 90 Civ. 0003 (LBS).**

United States District Court, S.D. New York.

Nov. 7, 1990.

Mark D. Schneider, Washington, D.C., for defendant-appellant Intern. Ass'n of Machinists and Aerospace Workers.

Peter Herman, Cohen, Weiss, & Simon, New York City, for defendants-appellants Air Line Pilots Ass'n Intern., et al.

William G. Ballaine, Mark S. Landman, Siff, Rosen & Parker, P.C., New York City, for plaintiff-appellee.

## OPINION

SAND, District Judge.

Defendants–Appellants International Association of Machinists and Aerospace Workers, AFL–CIO *et al.* (collectively "IAM") appeal from an injunction order entered by the Bankruptcy Court for the Southern District of New York on an application from Eastern Air Lines, Inc. ("Eastern"). *In re Ionosphere Clubs, Inc.*, 108 B.R. 901, 948 (Bkrtcy.S.D.N.Y.1989). The injunction limits IAM's allegedly unlawful strike activity which the Bankruptcy Court identified after an extensive hearing. *Id.* at 903–04. The basis for the IAM appeal is that the Bankruptcy Court had no jurisdiction to issue the injunction because this is not a "core" proceeding within the meaning of 28 U.S.C. § 157(b)(2) (1988). In the alternative, if this Court determines as a matter of law that the Bankruptcy Court had jurisdiction, IAM claims that the injunction should be vacated since it violates the statutory and constitutional rights of the strikers.

Defendant–Appellant Air Lines Pilots Association, International ("ALPA"), also appeals the decision below, but for different reasons. The Bankruptcy Court found that the injunctive order against ALPA became moot since ALPA had terminated its strike. *Ionosphere Clubs*, 108 B.R. at 908 n. 2. However, since Eastern in its complaint requested damages in addition to injunctive relief from all the defendants for torts committed, the Bankruptcy Court included ALPA in its Findings of Fact and Conclusions of Law. *Id.* ALPA claims that once the Court determined that Eastern's request for an injunction against ALPA was moot, it lacked authority to issue findings and conclusions regarding ALPA. ALPA brings a mandamus motion to vacate the Bankruptcy Court's Findings of Fact and Conclusions of Law as to ALPA. Plaintiff–Appellee Eastern opposes both the IAM and ALPA appeals.

This Court has jurisdiction of the appeal pursuant to 28 U.S.C. § 158 (1988). For the reasons stated below, this Court holds that this matter is a core proceeding but vacates the injunctive order entered by the Bankruptcy Court since it violates portions of the Norris–LaGuardia Act ("NLGA"). Therefore, this Court need not reach a decision on IAM's claim of constitutional violations. We deny ALPA's mandamus action since we find that ALPA suffers no cognizable injury by virtue of its inclusion in the findings of fact and conclusions of law which it could not appeal and which were the predicate of an order which is in any event vacated.[1]

## I. Background

Eastern is a well known company that provides commercial air service in the United States and abroad. On March 9, 1989 Eastern filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101–1330, following a labor dispute with the IAM which began on March 4, 1989. ALPA and the Transport Workers Union of America ("TWU") engaged in a sympathy strike in support of the IAM's efforts that lasted until late November, 1989. Presently, only the IAM is still on strike. Aspects of this bitter and protracted labor dispute are the subject of this litigation.

For many years prior to this dispute, Eastern and IAM were parties to collective bargaining agreements entered into pursuant to the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151–188, which governs such matters as rates of pay, rules and working conditions for mechanics and other IAM member employees.[2] The most recent agreement between the parties was executed on May 16, 1985 and expired on December 31, 1987. Pursuant to federal labor policy, both Eastern and the IAM were required to honor the terms of this agreement until they had exhausted the extended bargaining procedures of the RLA.

After Eastern and the IAM failed to agree on the terms of a new agreement in January, 1989 the parties were assisted in the negotiation process by the National Mediation Board ("NMB") pursuant to § 6 of the RLA, 45 U.S.C. § 156. A year later in February, 1989, the NMB concluded that mediation had been unsuccessful and terminated its services. This commenced a 30 day statutory cooling-off period, after which Eastern and IAM were freed from the procedures of the RLA and entitled to exercise economic self-help.

Before terminating its services and entering the cooling-off period, the NMB asked both Eastern and IAM if they would voluntarily agree to arbitration, pursuant to § 7 of the RLA, 45 U.S.C. § 157. IAM agreed to submit to arbitration. *See Ionosphere Clubs*, 108 B.R. at 907. Eastern declined. *Id.* Pointing to a financial weakening of the company, Eastern decided that submitting the dispute to binding arbitration was not in its best interest. Since there is no mandatory arbitration provision

---

**1.** At oral argument ALPA suggested that if IAM prevailed on this appeal and the Court vacated the injunction that its mandamus action would become moot. See oral argument transcript (August 30, 1990) at 6–7.

**2.** The RLA provisions relevant to this action apply to "every common carrier by air engaged in interstate or foreign commerce ..." 45 U.S.C. § 181 (1988).

in any relevant labor statute, Eastern violated no law in making this decision. The cooling-off period expired at 12:01 a.m. (EST) on March 4, 1989 at which time Eastern unilaterally implemented its proposals for a new labor agreement for IAM-represented employees, as it was permitted to do by law. 45 U.S.C. § 157. IAM then commenced its strike, as it also was permitted to do by law.[3] 45 U.S.C. § 157; *also see Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 378, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344 (1969).

Three days after IAM's strike was instituted, Eastern filed a petition for protection in the Bankruptcy Court for the Southern District of New York. The alleged unlawful actions began to occur shortly thereafter and Eastern commenced the injunctive proceeding that is the subject of this appeal. The Bankruptcy Court held long hearings and made factual findings concerning the strike activities. Although the strike itself was lawful, the Bankruptcy Court held that numerous tortious acts occurred continually over a fifteen month period. *Ionosphere Clubs*, 108 B.R. at 909–930.

In a lengthy opinion that resulted from 4000 pages of transcripts and 75 witnesses, the Bankruptcy Court described the types of acts IAM committed during this bitter strike in both New York and Georgia. *Id.* At LaGuardia Airport in New York, IAM members stormed Eastern's facilities, discouraged customers from patronizing Eastern's flights and interfered with non-union employees' efforts to report to work. Specific unlawful acts at the Eastern terminal included flooding bathrooms, interfering with skycaps assisting passengers and sabotaging baggage conveyor belts with "crazy glue." *Id.* at 910–911. Harassment was commonplace during this strike. The Bankruptcy Court found that strikers called passengers "scab" and "cheap ass" while telling them to have a "shit flight," that they will be "killed" and not to forget their "body bag." *Id.* at 911–912. East-

ern's non-union employees also were attacked. In at least one case, the car window of an employee was smashed. *Id.* at 913. The Bankruptcy Court found that similar acts also occurred at Hartsfield Airport in Georgia. *Id.* at 918–929.

Based upon its fact finding and conclusions of law, the Bankruptcy Court enjoined the IAM from engaging in certain strike related activities. The strikers were not allowed, among other things, to shout, bang or clap in a disruptive way, to trespass onto Eastern property, engage in mass picketing that interfered in any way with Eastern employees' and passengers' use of the public roads, or vandalize and assault property or persons. *Id.* at 948–950. It is not clear from the language of the injunction whether some of the limitations are only applicable in New York and Georgia or apply across the United States. The injunction is broad on its face and requires the order to be placed on union bulletin boards at all strike headquarter locations around the United States.

## II. Jurisdiction (Core or Non–Core Proceeding)

■ At issue in this appeal is the authority of a federal bankruptcy court to intervene on behalf of a debtor in a labor dispute. Before reaching the merits, this Court must focus on issues of jurisdiction. The threshold question is whether jurisdiction to resolve this labor dispute vests in the bankruptcy court or an article III tribunal. If a labor dispute is considered a "core proceeding" that directly involves the reorganization of the debtor, the bankruptcy court has jurisdiction. *See* 28 U.S.C. § 157. On the other hand, if the labor dispute is classified as only peripherally relevant to bankruptcy concerns, it is a non-core proceeding and an article III court must adjudicate the conflict. *See In re Wood*, 825 F.2d 90, 96 (5th Cir.1987). Any resolution to this question involves an examination of the scope of the bankruptcy power which has been determined by Con-

---

**3.** Members of ALPA and TWU were directed by their respective unions to honor IAM picket lines and not report to work as scheduled at Eastern. Support for fellow strikers is known as a "sympathy strike" and has been declared lawful under the RLA. *See Eastern Airlines v. ALPA*, No. 89–5229, 1989 WL 205343 (11th Cir. Mar. 24, 1989).

gress, subject to certain constitutional limitations. *See Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 73, 102 S.Ct. 2858, 2872, 73 L.Ed.2d 598 (1982).

Congress has defined federal bankruptcy court jurisdiction to include any adversarial proceeding which by its nature is core to restructuring the debtor-creditor relationship. 28 U.S.C. § 157(b)(1) (1988). Section 157(b)(2) of title 28 sets forth a non-exclusive list of matters that Congress has determined to be core proceedings. The relevant portion of the list for this action is "matter concerning the administration of the estate." 28 U.S.C. § 157(b)(2)(A). At issue is whether "matters concerning the administration of the estate" includes labor disputes. Little guidance has been provided by Congress on how broadly to interpret this language.[4]

Certain constitutional limits to the grant of the bankruptcy power were outlined by the Supreme Court in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 73, 102 S.Ct. 2858, 2872, 73 L.Ed.2d 598 (1982). In *Marathon*, the Court held that matters that merely relate to the administration of the estate must be adjudicated by an Article III judge. Traditional causes of action such as "state-created private rights ... to recover contract damages", may not be delegated by Congress to legislative tribunals such as a bankruptcy court. *Id.* at 71, 102 S.Ct. at 2871. According to the Supreme Court, these types of claims are far removed from the core bankruptcy power. *Id.* at 73, 102 S.Ct. at 2872. An underlying concern of the *Marathon* Court was that bankruptcy courts were encroaching upon powers that are reserved by the Constitution for Article III courts. *Id.* at 74, 102 S.Ct. at 2873.

This jurisdictional question of whether a matter is classified as a core or non-core proceeding determines, in a case such as this where no right to a jury trial is implicated, whether the bankruptcy court can issue a final order or merely a recommendation to the district court. According to § 157(b)(1), if the proceeding is core, the bankruptcy court "may hear and determine all cases ... arising under title 11 ... and may enter appropriate orders and judgments." *See In re Manville Forest Prods. Corp.*, 896 F.2d 1384, 1388 (2d Cir.1990). If the matter is determined to be a non-core proceeding the bankruptcy court may hear the matter, even absent the consent of the parties, but may only issue a report to the district court.[5]

In balancing between the statutory mandates of federal bankruptcy court jurisdiction and the *Marathon* case, most courts have held that the bankruptcy court is authorized to adjudicate the majority of proceedings that involve debtors. *See In re Arnold Print Works, Inc.*, 815 F.2d 165, 168 (1st Cir.1987). The law of this circuit has recently followed this trend. *See In re Ben Cooper*, 896 F.2d 1394, 1399 (2d Cir. 1990), *cert. granted*, —— U.S. ——, 110 S.Ct. 3269, 111 L.Ed.2d 779 (1990); (postpetition contract involving debtor was a core proceeding); *Forest Prods.*, 896 F.2d at 1389 (mere fact that claims raise issues of state law does not preclude holding that adversarial proceeding is core); *In re Johns–Manville Corp.*, 801 F.2d 60, 64 (2d Cir.1986) (debtor's request to enjoin state court action to compel shareholders' meet-

---

4. Neither the House nor the Senate issued a conference report. In the Congressional Record, the sponsors of this language suggested that 95% of the proceedings brought before the bankruptcy judges would be considered core. Section 157(b)(2)(A) was written to include a variety of proceedings, all of which could not be listed in the Bankruptcy Code. *See* 130 Cong. Rec. E1108–1110 (daily ed. March 21, 1984).

5. Since the bankruptcy court may hear adversary proceedings regardless of whether a proceeding is core or non-core, the primary difference involves the standard of review on appeal. If the matter is a core proceeding the appellate court reviews the bankruptcy court findings of fact under a clearly erroneous standard. *Brunner v. New York State Higher Educ. Servs. Corp.*, 831 F.2d 395, 396 (2d Cir.1987). In a non-core matter the facts found by the bankruptcy court are subject to de novo review. 28 U.S.C. § 157(c)(1) (1988). In a non-core proceeding where both parties consent to the bankruptcy court's jurisdiction a judgment by that court is final. 28 U.S.C. § 157(c)(2); *see also In re Men's Sportswear, Inc.*, 834 F.2d 1134, 1137 (2d Cir. 1987). In either case, the appellate court reviews questions of law de novo.

ing of debtor's company was a matter concerning the administration of the estate).

In a case directly related to the subject of this appeal, the Third Circuit, followed a broad interpretation of section 157(b)(2)(A), and recently held that labor disputes are core proceedings. In *Elsinore Shore Assoc. v. Local 54, Hotel Employees & Restaurant Employees International Union,* 820 F.2d 62, 66 (3d Cir.1987), the debtor requested an injunction preventing the union from striking. The question was whether a strike would be lawful based on the language in a collective bargaining agreement. *Id.* Without elaboration, the Court held that the dispute was a core proceeding since it was a matter that concerned the administration of the estate and that the bankruptcy court had jurisdiction to enter a final order.[6] *Id.* at 66. If the *Elsinore* labor dispute constitutes a core proceeding this Court finds no meaningful way to distinguish the instant action. On the precedent of the *Elsinore* case and recent Second Circuit holdings, this Court concludes that this case is a core proceeding.

The Court takes notice that Eastern filed for bankruptcy three days after the IAM instituted a lawful strike. Considering certain labor disputes to be core proceedings does not and should not allow employers to use the bankruptcy courts as protection from adhering to federal labor law requirements. As the Bankruptcy Court judge explicitly recognized, the power of the bankruptcy court to grant injunctive relief is no different or greater than that of a district court. The classification of proceedings as core or non-core primarily effects the standard of review on appeal, which is important, but does not, at least in this case, undermine federal labor policy.[7] Nor does it in any way effect the outcome of this case. Were this Court to treat the Bankruptcy Court judge's opinion as a re-

port and recommendation and review the facts relevant to IAM de novo we would reach the same result.[8]

### III. Application of the Norris–LaGuardia Act

■■■ In addressing the merits of the case, this Court is cognizant of the tensions between the purposes of the Bankruptcy Code and the NLGA. A paramount and important goal of Chapter 11 is the rehabilitation of the debtor by offering breathing space and an opportunity to rehabilitate its business and eventually generate revenue. *See In re Johns–Manville Corp.,* 801 F.2d at 62. In contrast, Congress passed the NLGA to prevent the use of injunctions by federal courts from "upsetting the natural interplay of the competing economic forces of labor and capital." *Brotherhood of R.R. Trainmen v. Chicago R. & I.R. Co.,* 353 U.S. 30, 40, 77 S.Ct. 635, 640, 1 L.Ed.2d 622 (1957). Under one statutory scheme the federal courts are directed to protect employers and in the other they are required to be neutral.

■■■ The particular conflict on the merits of this case involves the anti-injunction provisions of the NLGA and the Bankruptcy Court's power to enjoin actions that interfere with the reorganization of the debtor and protection of estate assets. Concern for preserving estates in bankruptcy and the *status quo* has a long history based on the concept of *custodia legis. See Mueller v. Nugent,* 184 U.S. 1, 14, 22 S.Ct. 269, 274, 46 L.Ed. 405 (1902); *Cf. Ex parte Baldwin,* 291 U.S. 610, 615, 54 S.Ct. 551, 553, 78 L.Ed. 1020 (1934). Yet, this concept has exceptions and limitations. "Congress never intended to supersede ... *sub silencio* " the NLGA when it passed the Bankruptcy Reform Act of 1978. *In re Petrusch,* 667 F.2d 297, 300 (2d Cir.1981). Bankruptcy courts are, therefore, required to apply the laws that bind this circuit in adjudicating

---

6. The *Elsinore* Court vacated portions of the injunction after establishing that the bankruptcy court's findings of fact were "clearly erroneous." 820 F.2d at 69.

7. In a labor dispute where the timing of the issuance of an injunction was important, a union could, by law, appeal the bankruptcy court

decision immediately to the court of appeals. Norris LaGuardia Act, 29 U.S.C. § 110 (1988).

8. IAM has withdrawn its request for further briefing were this standard of review to be invoked.

labor conflicts. The applicable statutes in this action are the RLA and the NLGA.

The NLGA was enacted in 1932 with the specific and limited purpose of divesting federal courts of jurisdiction to issue injunctions in labor disputes. *See Milk Wagon Drivers' Union v. Lake Valley Farm Products, Inc.*, 311 U.S. 91, 102, 61 S.Ct. 122, 127, 85 L.Ed. 63 (1940). Congress concluded that the federal judiciary was abusing its equity powers and, often on an ex parte basis, issued injunctions that inhibited lawful labor union activities. *See United Steelworkers of America v. United States*, 361 U.S. 39, 67, 80 S.Ct. 1, 7, 4 L.Ed.2d 12 (1959). To remedy this perceived problem the legislature sent a strict and clear message to the courts. The NLGA provides "No court of the United States ... shall have jurisdiction to issue any injunction in a case involving or growing out of a labor dispute, except in strict conformity with the provisions of this chapter." 29 U.S.C. § 101. In the ensuing years the courts have continually followed the language of the NLGA. *See Burlington N.R. Co. v. Brotherhood of Maintenance of Way Employes*, 481 U.S. 429, 435, 107 S.Ct. 1841, 1845, 95 L.Ed.2d 381 (1987). There are few cases where the courts have made exceptions.[9]

■ Although the NLGA anti-injunction mandate is not absolute, it prescribes certain procedural requirements that must be followed before a party can successfully pursue equity relief in a federal court. Section 8 provides "No injunctive relief shall be granted to a party "who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration." 29 U.S.C. § 108; *see also Rutland R. Corp. v. Brotherhood of Locomotive Engineers*, 307 F.2d 21, 37 (2d Cir.1962), *cert. denied*, 372 U.S. 954, 83 S.Ct. 949, 9

L.Ed.2d 978 (1963). The policy behind this requirement is that often strikes and the violence which sometimes accompanies them, can be averted by requiring the parties to adhere to certain procedures before asking for the aid of a federal court.

The seminal case interpreting section 8 of the NLGA is *Brotherhood of R.R. Trainmen v. Toledo, P. & W. Railroad*, 321 U.S. 50, 65, 64 S.Ct. 413, 421, 88 L.Ed. 534 (1944). As in this action, the *Toledo* case arose out of a protracted labor dispute that resulted in mediation and then the refusal of the parties to arbitrate pursuant to the RLA. After the strike began various incidents involving violence or threats of violence took place. Some of the attacks were against people and others created damage to property. Although there was disagreement over the extent of the violence, the lower court held it "was substantial." *Id.* at 53, 64 S.Ct. at 415. Certainly there was an interruption in the rail service as a result of the strike and the aid of the public authorities was inadequate to arrest the strikers and contain the disruption and violence. *Id.*

In refusing to issue an injunction, the Supreme Court held that the parties had not fully exhausted all the statutorily required mediation, negotiation and arbitration provisions under the RLA. Since the parties did not agree to voluntary arbitration the Court held that they had not made a "reasonable effort to settle" the dispute. *Id.* at 56, 64 S.Ct. at 416. As the Court wrote "Section 8 demands this method [i.e. arbitration] be exhausted before a complainant ... may have injunctive relief." *Id.* Since the statutory language requires that "every" reasonable effort be made, the *Toledo* Court read this language to mean that all three conciliatory devices be used. *Id.* at 57–58, 64 S.Ct. at 417–18. To construe the section as requiring otherwise, the Court reasoned, "would emascu-

**9.** A *Boys Markets* injunction is the prime example of an exception. The Supreme Court held that an injunction may issue when an agreement between an employer and employee binds them both to arbitrate and one party does not adhere to that contractual arrangement. The Supreme Court held that federal courts may enjoin activities that violate what is known as a no-strike clause since its purpose is to encourage arbitration which is compatible with the NLGA. *See Boys Mkts., Inc. v. Retail Clerks Union*, 398 U.S. 235, 253–54, 90 S.Ct. 1583, 1593–94, 26 L.Ed.2d 199 (1970).

late the language and defeat the purpose and policy of the statute." *Id.* at 60, 64 S.Ct. at 419.

Section 8 of the NLGA does not, however, impose any legal obligation on the parties to engage in any of the enumerated dispute resolution provisions. Likewise, section 7 of the RLA does not require the parties to arbitrate. Arbitration is entirely voluntary. *Id.* at 62, 64 S.Ct. at 419. As the Supreme Court held in *Toledo*, "[A respondent's] failure or refusal to arbitrate has not violated any obligation upon it, whether by the Railroad Labor Act or by the Norris–LaGuardia Act." The Court continued "Respondent is free to arbitrate or not, as it chooses. *But if it refuses, it loses the legal right to have an injunction issued by a federal court.*" *Id.* at 63, 64 S.Ct. at 420 (emphasis added). In other words, section 8 is a "clean hands" provision. The Court reasoned that the fundamental principle of equity that "he who seeks justice must do justice" applies in labor disputes. *Id.* at 60, 64 S.Ct. at 419.

Over the years the Supreme Court has continually supported the *Toledo* rationale and holding. In *Order of R. Telegraphers v. Chicago & N.W.R. Co.*, 362 U.S. 330, 333, 80 S.Ct. 761, 763, 4 L.Ed.2d 774 (1960), the Court held that when a railroad refused to mediate and negotiate with the union over a major labor dispute it did not have the clean hands required under *Toledo* to seek an injunction in federal court. Later in *Brotherhood of Ry. & S.S. Clerks, etc. v. Florida E.C.R. Co.*, 384 U.S. 238, 247, 86 S.Ct. 1420, 1425, 16 L.Ed.2d 501 (1966), again upholding the *Toledo* rationale, the Supreme Court wrote that if an employer "precipitated the strike by refusing to arbitrate" the company would be "barred from

obtaining injunctive relief." Even when the Supreme Court created one of its few exceptions to the NLGA where injunctions are allowable, it held that the *Toledo* policy in favor of dispute resolution was being furthered and as such was not in conflict with the holding. *Boys Mkts*, 398 U.S. at 235, 90 S.Ct. at 1585.

The Second Circuit has also supported the *Toledo* reading of the NLGA and its underlying interest of limiting judicial interference and encouraging arbitration. *See United Parcel Serv., Inc. v. International Bhd. of Teamsters, et al.*, 698 F.2d 100, 105 (2d Cir.1983); *Local 553, Transp. Workers Union v. Eastern Air Lines, Inc.*, 695 F.2d 668, 679 (2d Cir.1982). As the *United Parcel* Court wrote "a party which does not make 'every reasonable effort to settle [a labor] dispute ... should be precluded from seeking relief in a federal court.'" 698 F.2d at 105 (quoting *Toledo*, 321 U.S. at 58, 64 S.Ct. at 418). In discussing "every reasonable effort" the Second Circuit cited directly to the *Toledo* decision as the governing standard. *Id.*[10]

The facts in the instant action fit squarely within the *Toledo* holding. Eastern and IAM negotiated over a new collective bargaining agreement and after failing to reach consensus both sides resorted to the NMB procedures. When agreement still could not be reached, the NMB suggested arbitration. Eastern declined. As the Bankruptcy Court concluded, "Eastern made a reasonable, good faith decision to decline the NMB's offer to submit the dispute to binding arbitration, as was its right under the RLA." *Ionosphere Clubs*, 108 B.R. at 907. The Court continues "Given Eastern's dire financial condition, the Court

---

10. The Court of Appeals for the Seventh Circuit has taken a narrower view of the *Toledo* interpretation of the NLGA statutory language "every reasonable effort to settle." Recently that Court held that "in limited circumstances courts have refused such a mechanical approach." As the Court wrote in defining limited circumstances, "The Norris–LaGuardia Act has never been construed to bar an injunctive remedy when such relief is necessary to reach important objectives of federal labor law." *Air Line Pilots Ass'n, Int'l v. United Air Lines, Inc.*, 802 F.2d 886, 901 (7th Cir.1986), *cert. denied*, 480 U.S. 946, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987). Since the basic purpose of the NLGA is preserved by barring Eastern from injunctive relief in this instance, the Court concludes that the *United Air Lines* case is not in conflict with our holding. This Court's decision encourages employers to arbitrate their disagreements with unions. It discourages employers from relying on the economic pressures that occur in bankruptcy as a means to avoid arbitration. As such, this holding furthers "the objectives of federal labor law." *Id.* at 901.

finds that prior to commencing this proceeding for injunctive relief, Eastern made every reasonable effort to settle its dispute with the IAM by negotiation or with the aid of available government machinery or mediation or voluntary arbitration." *Id.* at 908.

The Bankruptcy Court erroneously applied federal labor law in holding that Eastern had adequately complied with the procedural requirements outlined in the NLGA and analyzed in *Toledo.* The Bankruptcy Court is correct that the "every reasonable efforts" test does not require a party to submit to arbitration. Eastern was within its right to decline to arbitrate for whatever reason it stated. As explained in *Toledo,* however, Eastern then forfeited its right to ask a federal court later for injunctive relief. 321 U.S. at 63, 64 S.Ct. at 420.

The primary argument that Eastern advances against this understanding of section 8 of the NLGA, and that the Bankruptcy Court accepted, is that these anti-injunction provisions do not prohibit federal courts from enjoining violent and coercive conduct incident to a labor dispute. This is an appealing argument but lacks merit under the prevailing legal standards governing labor disputes such as the one in this instance. In *Toledo* the Court specifically addressed this issue and concluded that "the terms of [section 8] ... offer no support for the view that it does not apply when violence is involved." 321 U.S. at 65, 64 S.Ct. at 421. The Court continued "And, if exceptions exist, to find one in the circumstances shown by this record would be to invert the statutory order of things." *Id.* The Court was clear that the "denial of [injunctive] assistance is the sanction the statute affords to secure performance of the prescribed preventive measures." *Id.*

This procedural mandate in *Toledo* is not absolute. In general terms the Act was not intended to interfere with the power of any court to restrain violence. It was contemplated expressly in section 7 of the NLGA that a court may prevent unlawful actions. 29 U.S.C. § 107. The limitation, however, is that a court may intervene only "when the particular circumstances show the complainant has had no opportunity to comply with such requirements as those of section 8." *Toledo,* 321 U.S. at 65, 64 S.Ct. at 421. As the *Toledo* Court concluded "the discussion of section 8 in the Congressional debates shows that, while it would not apply if on the facts the complainant could not meet its terms, it was intended to apply when he had ... opportunity but refused to do so." *Id.* at 66, 64 S.Ct. at 421. According to the *Toledo* Court, section 8 requirements must be met before other NLGA statutory provisions become applicable to a labor dispute.

Under this standard, Eastern is barred from seeking injunctive relief from violence in the federal courts since it did not comply with the procedural requirements in section 8 of the NLGA. Eastern, in other words, did not enter the federal courthouse with clean hands. The Bankruptcy Court was incorrect in applying section 7 of the NLGA to this action. Without explicitly discussing either *Toledo* or section 8 of the NLGA, the Bankruptcy Court concluded, we believe incorrectly, that it may enjoin unlawful strike activity that effects a debtor under its jurisdiction. Examining the depressed economic situation of the debtor, the Bankruptcy Court concluded as a matter of fact, that Eastern's decision not to engage in binding arbitration was reasonable. But presumably every party's decision not to arbitrate is predicated on its perception of its economic benefit. Neither the circumstance that the decision is made in the context of bankruptcy proceedings nor the extent of the economic pressures not to arbitrate renders the conduct "reasonable." Since this Court views the determination of "every reasonable effort" as construed by the Supreme Court in *Toledo* to be a question of law, which must be resolved in favor of the union in this instance, the injunction must be vacated.

A review of the law on violence surrounding labor disputes confirms the *Toledo* understanding on the interaction between section 7 and section 8 of the NLGA. Federal courts have tended to enjoin violence in two types of actions. The first group of cases involve violence that occurred after the parties had exhausted all statutorily required procedures for labor

disputes. In *Railroad Trainmen,* 394 U.S. at 386, 89 S.Ct. at 1119, the Court stated in dicta that violent behavior would be enjoinable when it occurred as part of the self-help effort after the cooling off period. The Court, however, was considering a case where the parties had fulfilled the dispute resolution provisions under the RLA and the NLGA. *Id.* at 371, 89 S.Ct. at 1111. Likewise, in *Westinghouse Broadcasting Co. v. Dukakis,* 412 F.Supp. 580, 581 (D.Mass.1976), the district court enjoined violence that occurred during a strike pursuant to section 7 of the NLGA. Yet, the Court was clear in stating that both parties had availed themselves of all dispute resolution processes, including voluntary arbitration. *Id.* at 581. In both of these cases the hands of the company were clean when they appeared at the gates of the federal courthouse. *See Toledo,* 321 U.S. at 60, 64 S.Ct. at 418.

A second type of case where violence has been enjoined is when random unlawful acts occurred that were explicitly found to have been unrelated to an extended labor dispute. *Scott v. Moore,* 680 F.2d 979, 982 (5th Cir.1982), *rev'd on other grounds, sub nom. United Bhd. of Carpenters & Joiners, Local 610 v. Scott,* 463 U.S. 825, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983). Since the *Moore* case involved an isolated incident of violence unconnected to either a protracted labor dispute or negotiations between labor and management, the issuance of an injunction was entirely consistent with section 8 of the NLGA. In the *Toledo* framework this case was an occasion when the employer "had no opportunity to comply with the requirements of section 8" by arbitrating, mediating or negotiating and thus was not barred from asking a federal court to issue an injunction under section 7. *Toledo,* 321 U.S. at 65, 64 S.Ct. at 421.

There is one other instance where the Supreme Court has upheld injunctions issued to limit violence that occurs in the context of labor disputes. In cases involving an injunction entered by a state court based on an applicable state statute, the Supreme Court has not required NLGA requirements to be met. The NLGA procedures only apply to federal courts unless the state legislature has adopted its requirements. In *Youngdahl v. Rainfair, Inc.,* 355 U.S. 131, 132, 78 S.Ct. 206, 208, 2 L.Ed.2d 151 (1957), the Supreme Court, on appeal from the Arkansas State Supreme Court, upheld an injunction that halted violence which occurred in the context of picketing by employees. It is exactly this type of remedy among others that the Supreme Court in *Toledo* suggested was available if needed to address labor unrest. 321 U.S. at 63, 64 S.Ct. at 420.

■ The *Youngdahl* holding is relevant to the present action since this Court's decision does not suggest that Eastern is without rights to seek relief from violence that may occur during the IAM strike. Rather, at issue in this action is a question of the proper legal issue in an acceptable forum. Eastern may be able to obtain an injunction from the New York State courts based on New York statutes. Likewise, Eastern may apply for injunctive relief in Georgia. Also suits for recovery of damages based on tort law are available to Eastern in a number of courts. In that light, Eastern is not entirely without a federal remedy. Under *Toledo,* other than an injunction, Eastern is free to seek either damages or apply for criminal sanctions against the IAM or any of its members if federal jurisdiction is shown to exist. 321 U.S. at 63, 64 S.Ct. at 420. The NLGA and the *Toledo* decision merely deprive Eastern of one form of remedy, which Congress, in "exercising its plenary control over the jurisdiction of the federal courts," has seen fit to withhold. *Id.* at 64, 64 S.Ct. at 420; *cf. Lauf v. E.G. Shinner & Co.,* 303 U.S. 323, 58 S.Ct. 578, 82 L.Ed. 872 (1938).

A final argument that Eastern presents is that a conflict exists between the objectives of the RLA and the NLGA. Eastern urges that any inconsistencies between the statutes should be resolved in favor of the purposes of the RLA. This position has been rejected in this circuit. In *Local 553, Transp. Workers v. Eastern Air Lines,* 695 F.2d 668 (2d Cir.1982), the Court specifically addressed the compatibility of the RLA and the NLGA. As the Court wrote "when the NLGA and the RLA both apply

**438**

to a dispute" there must be an accommodation of the two statutes. *Id.* at 678. Yet, in conclusion the Court held "Section 8 of the NLGA, however does not conflict with the RLA." *Id.* at 679. Since section 8 is the relevant portion of the NLGA at issue in this action, Eastern's argument has no merit.

More generally, both the RLA and the NLGA endeavor to promote the free association of union groups and favor the resolution of disputes through non-judicial means. Focusing on the broad NLGA requirement that "every reasonable effort" must be made to settle conflicts, courts have held that any RLA exception to the NLGA is necessarily a limited one. *Burlington*, 481 U.S. at 429, 107 S.Ct. at 1842. Since Eastern does not have clean hands and no exception is applicable to this action, this Court finds that the injunction was improperly issued by the Bankruptcy Court.

Nothing in this opinion should be taken to be condonation of any unlawful acts committed by the strikers at different airports around the United States. The decision of this Court is limited to its holding that under the NLGA, Eastern is barred from seeking injunctive relief in any federal court. Eastern is free to seek other forms of remedies in federal court and all types of relief in state courts.

The injunctive order of the Bankruptcy Court is vacated.

### IV. ALPA's Mandamus Motion

Since the only order predicated on the Bankruptcy Court's findings of fact and conclusions of law is vacated by virtue of our holding, ALPA's mandamus action is addressed to language in the Bankruptcy Court's opinion which has no operative effect as to any party and never had any operative effect as to ALPA. ALPA objects that it should not be the subject of adverse findings of fact contained in an opinion which it could not appeal. But even with respect to one having the right to appeal, whenever a lower court opinion is reversed on less than all of the grounds urged by the appellant and the reversing court does not address all of the issues raised on appeal, language in the lower court opinion remains for whatever limited weight persons may seek to ascribe to it. Insofar as ALPA's concern is that other courts may give precedential weight to the Bankruptcy Court's findings of fact, we believe the record as to ALPA's inability to appeal those findings is clear and that ALPA is entitled to no further relief. *See In re Drexel Burnham Lambert, Inc.*, 869 F.2d 116, 117 (2nd Cir.1989) (mandamus petition subject to strict standards demonstrating a clear and indispensable right to such relief).

In the event that Eastern pursues its claims for monetary damages against ALPA and such damages are awarded predicated in whole or in part on the findings of fact, ALPA will of course be free to challenge, for the first time in an appellate court, those findings of fact.

Mandamus denied.

SO ORDERED.