**LOCAL 217 HOTEL & RESTAURANT EMPLOYEES UNION, et al.**

v.

**MHM, INC.**

Civ. No. H–90–1038 (JAC).

United States District Court, D. Connecticut.

Aug. 22, 1991.

Ruth L. Pulda, Daniel E. Livingston, Gould, Livingston, Adler & Pulda, Hartford, Conn., for plaintiffs.

Emanuel N. Psarakis, Duncan R. MacKay, Robinson & Cole, Hartford, Conn., for MHM, Inc.

Glifford J. Grandjean, Sorokin, Sorokin, Gross, Hyde & Williams, P.C., Hartford, Conn., for Constitution Management Corp.

John P. Pavia, III, Taggart D. Adams, Kelley, Krye & Warren, Stamford, Conn., for Colonial Constitution East Ltd. Partnership.

Richard P. Weinstein, Pearson, Baum & Weinstein, P.C., Kerry M. Wisser, Weinstein & Wisser, West Hartford, Conn., for Colonial Realty/USA Corp.

## ORDER

JOSÉ A. CABRANES, Chief Judge.

Following review of the record, plaintiffs' objections are OVERRULED, and the recommended ruling of the Magistrate Judge Margolis is APPROVED and ADOPTED as the ruling of the court. It is so ordered.

## RECOMMENDED RULING ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

MARGOLIS, United States Magistrate Judge.

On December 18, 1990, plaintiffs Joseph Jean, Frederick Grilli, and Harry Parlee, who were formerly employed at the Summit Hotel until its precipitous closing on August 10, 1990, and plaintiff Local 217, the union to which the individual plaintiffs belong, commenced this action against defendant MHM, Inc. ["defendant" or "MHM"], claiming violation of their rights under the following four federal statutes— § 301 of the Labor Management Relations Act ["LMRA"], as amended, 29 U.S.C. § 185 (First Count); the Worker Adjustment and Retraining Notification Act of 1988 ["WARN"], 29 U.S.C. § 2102 (Second Count); the Consolidated Omnibus Budget Reconciliation Act of 1986 ["COBRA"], 29 U.S.C. § 1161 et seq. (Third Count); and § 404(a)(1)(A), (B), and (D) of the Employee Retirement Income Security Act of 1974 ["ERISA"], as amended, 29 U.S.C. § 1104(a)(1)(A), (B), and (D).[1] The next day, on December 19, 1990, plaintiffs filed an application for temporary restraining order ["TRO"], a motion for preliminary injunction, and brief in support of both.[2] (Dkt. ## 4-6).

On January 4, 1991, a hearing was held before U.S. District Judge Jose A. Cabranes (see Dkt. ## 7-8, 21), at the conclusion of which Judge Cabranes denied the TRO application (Dkt. # 21, at 24-26). Judge Cabranes scheduled the evidentiary hearing on plaintiffs' motion for preliminary injunction for January 17, 1991 (id. at 26-27, 34), permitted both sides to submit affidavits in lieu of direct examination (id. at 28-29, 30-31), and established deadlines for the filing of certain motions (id. at 5-8, 27, 29-30, 31-33).[3] On January 10 and 11, 1991, plaintiffs submitted four affidavits. (Dkt. ## 13-15, 20). On January 16, 1991, Chief Judge Ellen Bree Burns referred the motion for preliminary injunction to this Magistrate Judge in light of Judge Cabranes' serious illness. (Dkt. # 23). On January 31, 1991, defendant filed its brief in opposition to plaintiffs' motion. (Dkt. ## 32-33).

Such evidentiary hearing was held before this Magistrate Judge on Friday, February 1, 1991 and on Monday, February 4, 1991, at which a joint stipulation of facts ["Jt. Stip."] was filed. (Dkt. ## 34-35).[4] Four individuals testified for plaintiffs—Soula Bitsounis, Frederick Grilli, Harry Parlee, and Joseph Jean, and two individuals testified for defendant—Jerry Brophy and Michael Burke. In addition, two witnesses were called by both sides—Dennis Cahill and Connie Holt. With permission of the court, on February 19, 1991 and February 21, 1991, defendant and plaintiffs, respectively, filed lengthy post-hearing briefs. (Dkt. ## 46, 41, 42, 45). Supplementary letter-briefs were submitted by plaintiffs and defendant on March 4, 1991 and March 8, 1991, respectively.

For the reasons stated herein, plaintiffs' motion for preliminary injunction is de-

---

1. Five exhibits were attached to this complaint.

2. Attached to this brief were affidavits from four of the plaintiffs.

3. See note 5 infra.

4. The stipulations were identical, except the February 4th version refers to the joint exhibits in the same manner as they were introduced at the hearing.

The transcript from February 1, 1991 was filed on February 6, 1991 (Dkt. # 36) and is referred to as "Tr." The transcript from the February 4th session was filed on February 8, 1991 (Dkt. # 37) and is referred to as "Tr." The parties submitted Joint Exhibits ["Jt. Exh."] 1 through 62E; plaintiffs admitted four exhibits of their own—Ps' Exhs. 1A, 1B, 2 and 3; and defendant admitted one exhibit—D's Exh. A.

nied.[5]

## I. FACTUAL BACKGROUND

Prior to December 1988, the 287–room Summit Hotel in Hartford, Connecticut was owned by the Travelers Indemnity Co. ["Travelers"], through Constitution Plaza, Inc. (Jt. Exh. 58, ¶ 2). On January 1, 1983, Constitution Plaza, Inc. entered into a twenty-eight page "Management Contract" with defendant MHM, Inc., a Delaware corporation with its principal place of business in Dallas, Texas,[6] under which MHM was "... to supervise and administrate ... the management and operation ..." of the Summit Hotel. (Jt. Exh. 9, ¶ 1(a)). Paragraph 2(b) of this Management Contract provided in pertinent part as follows:

*Employees; Independent Contractor.* ... All matters pertaining to the employment, supervision, compensation, promotion and discharge of such employees are the responsibility of ... M.H.M., which is in all respects the employer of such employees. M.H.M. will negotiate with any union lawfully entitled to represent such employees and may execute in the name of the hotel, [sic] collective bargaining agreements or labor contracts resulting therefrom. M.H.H. [sic] shall fully comply with all applicable laws and regulations having to do with worker's compensation, social security, unemployment insurances, hours of labor, wages, working conditions, and other employer-employee related subjects.... This Agreement is not one of agency by ... M.H.M. for [Constitution Plaza, Inc.] but one with ... M.H.M. engaged independently in the business of managing properties on its own behalf as an independent contractor. All employ-

ment arrangements are therefore solely its concern and [Constitution Plaza, Inc.] shall have no liability with respect thereto.

Paragraph 18 further provided that Constitution Plaza, Inc. retained the right to assign this agreement to any purchaser of the Summit Hotel, provided such purchaser expressly assumed same in writing. The Management Contract was to remain in effect until December 31, 1985, with automatic renewal, if not terminated by either party, for two independent successive terms of three years each. (*Id.* ¶ 9 & 9(a)).

While this Management Contract was in force, on October 1, 1987, the forty-four page Collective Bargaining Agreement at issue in this litigation was executed between plaintiff union Local 217 and MHM. (Jt. Exh. 1, at 44). Like many of the documents discussed in this recommended ruling, the Collective Bargaining Agreement contains inconsistencies as to its parties. Like the signatory section, the first definitional section on page 1 indicates that MHM is the "Employer." However, the cover page reflects that the agreement is between Local 217 and "The Summit Hotel." Travelers is not mentioned in the entire agreement, and had no involvement in its negotiation. (*Tr.* 82; Tr. 177).

Under this agreement, plaintiffs were entitled to a wide variety of benefits, including sick leave (§ 8), vacations (§ 23), group health insurance, group dental insurance, life insurance, and disability insurance (§ 30), and pension benefits (§ 31). Section 45.1 further provided that the agreement was to remain in full force and effect through September 30, 1990, and would be automatically renewed from year to year

---

**5.** There is one additional substantive motion pending before this Magistrate Judge—defendant's motion to dismiss, filed January 7, 1991 (Dkt. ## 11–12), as to which plaintiffs filed a brief in opposition on January 18, 1991 (Dkt. # 25). By agreement of counsel on February 1, 1991, this motion was converted into one for summary judgment, under F.R.Civ.P. 56, and was to be held in abeyance pending a recommended ruling on plaintiffs' motion for preliminary injunction, so that both parties would have an opportunity to supplement the record. (Tr. 8–9).

On January 11, 1991, Judge Cabranes provisionally permitted defendant's oral application to cite in third party defendants. (Dkt. # 21, at 29–30, 31–33. *See also* Dkt. ## 16–19). On January 30, 1991, defendant filed a third-party complaint against Colonial Constitution East Limited Partnership, Colonial Realty/USA Corp., and Constitution Management Corp. (Dkt. # 26).

**6.** MHM, Inc. is also known as Motor Hotel Management, Inc.

unless terminated in writing by either party.

In December 1988, the Summit Hotel was purchased by Colonial Constitution East Limited Partnership ["CCELP"], a Connecticut limited partnership, the purpose of which was to acquire the Summit Hotel.[7] (Jt. Exh. 58, ¶ 5; Jt. Exh. 62B, ¶ B; Jt. Stip. ¶¶ 5 & 9). MHM had no involvement in the transfer of the hotel from Travelers to CCELP. (Tr. 91). MHM has no common ownership interest, general or limited partners, shareholders, officers or directors with CCELP, or in the Summit Hotel. (Jt. Stip. ¶¶ 7–8; Jt. Exh. 58, ¶ 6). On December 8, 1988, CMC and MHM entered into a letter-agreement, under which the 1983 Management Contract was terminated, a new basis for compensation was established, and the parties agreed to use all reasonable efforts to negotiate a new agreement. (Jt. Exh. 10). Five days later, however, CMC (as agent for CCELP) and MHM entered into a supplemental letter-agreement which reinstated the 1983 Management Contract during the term of negotiations, except for the compensation provisions set forth in the December 8th letter-agreement. (Jt. Exh. 11). A third letter-agreement was signed by CMC (again as agent for CCELP) and MHM on March 15, 1989, which provided that the 1983 Management Contract would continue on a month-to-month basis, except for the compensation provisions found in the December 8th letter-agreement. (Jt. Exh. 12). The next day, MHM forwarded a letter to Colonial Realty Co., the third paragraph of which stated: "The employees of the Summit Hotel became employees of [CCELP] at the time of the ownership change, per our agreements and as stated in the proposed management contract." (Jt. Exh. 13). Local 217 neither received a copy of this letter nor was advised of its contents. (Tr. 89–90, 91, 124–25). Both sides agreed, however, Local 217's relationship with MHM was not altered by the purchase of the Summit Hotel by CCELP, in that MHM continued to remain in charge of the hotel in its day-to-day operations, including hiring of employees, firing of employees, discipline of employees, processing of wages, and grievance procedures. (Tr. 76–78, 80–86, 120–21, 122–24).

Like the documents discussed above, there are also inconsistencies in the submissions to governmental agencies with respect to the wages of the employees of the Summit Hotel. For example, plaintiff Grilli's Wage and Tax Statements (IRS Form W–2) for the tax years 1988 and 1989 list the employer as "MHM, INC. C/SUMMIT HOTEL–HARTFORD." (Ps' Exh. 2; Jt. Exh. 4). Michael Burke, who was the General Manager of the Summit Hotel from February 4, 1985 until August 1988 and a Vice President of MHM thereafter (Tr. 75–76), characterized this as a "data processing mistake," in that the federal employer identification number belongs to CCELP. (Tr. 48–49). The Employer's Annual Federal Unemployment (FUTA) Tax Return for tax year 1988, the Employer's Quarterly Federal Tax Return (IRS Form 941) for the last quarter of 1988, and the Employer Summary of Form W–2 Magnetic Media Wage Information (IRS Form 6560) for tax year 1989 all list CCELP as the employer. (Jt. Exhs. 16, 17, 61; Tr. 49–50). The same is true for completed forms provided to the Employment Security Division of the Connecticut Department of Labor for the last quarter of 1988. (Jt. Exhs. 14 & 15).

Commencing in late December 1989, MHM, as agent for Summit Hotel, contacted Blue Cross & Blue Shield of Connecticut, Inc. ["BC & BS"] to revise the coverage for the hotel's employees. (See Jt.

---

7. The general partner of CCELP is Colonial Realty/USA Corp.; the limited partners of CCELP are Jonathan Googel, Benjamin Sisti, Frank Shuch, and William Candelori. (Jt. Exhs. 62A–62C; Tr. 217). Colonial Realty/USA Corp. is a Delaware corporation with its principal place of business in West Hartford, Connecticut; its corporate officers and directors are Messrs. Googel, Sisti, Shuch, and Candelori. (Jt. Exh. 62D; Tr. 217–18). Unlike many of the other Colonial Realty related entities, neither CCELP nor Colonial Realty/USA Corp. is subject to bankruptcy proceedings. (Tr. 218).

CCELP's managing agent was Constitution Management Corp. ["CMC"], a Connecticut corporation, whose president is Frank Shuch. (Jt. Exh. 62E).

Exhs. 45, 31, 43, 46–50). Effective February 1, 1990, the health insurance was converted from a fully insured arrangement to a self-insured arrangement; an "Administrative Services Only Agreement" ["ASO"][8] was entered with BC & BS and was signed by Robert Lobo, the hotel's General Manager in which the employer is listed as "The Summit Hotel." (Jt. Exh. 18; Tr. 36–37, 38–40, 46–51. *See also* Jt. Exh. 32).

Between January 1990 and May 1990, MHM engaged in lengthy negotiations with Local 217 with respect to the layoff of approximately twenty employees of the Summit Hotel's restaurant, Gabriel's Cafe. (*Tr.* 91–92). Although MHM had made the recommendation to close the restaurant, CCELP had the "final say" both with respect to the layoff themselves and the severance package to be given. (*Tr.* 100, 102–03). On May 15, 1990, Local 217 and MHM entered into a lengthy letter-agreement, effective as of February 1, 1990, with respect to this "reduction in force." (Jt. Exh. 5, ¶ 1.A). This agreement reaffirmed the hotel's right to lay off employees in accordance with and pursuant to the 1987 Collective Bargaining Agreement. (*Id.*)

The Summit Hotel was a financial burden to its respective owners for eighteen years and during 1990 it continued to lose substantial money. (Tr. 239–40, *Tr.* 36–37, 57–58). On or about June 19, 1990, Lobo received a copy of a report from an accountant for Colonial Realty, a copy of which also was sent to Sisti, which concluded that the Summit Hotel had "experienced a significant operating loss in 1989 and is expected to have negative net operating income for 1990 which will greatly exceed the loss budgeted for the year." (Ps' Exh. 3, at 8; Tr. 65, 66, 68). This report further recommended "disposition of the subject property ... during 1990." (Ps' Exh. 3, at 8). Burke testified that he "discounted"

this report, as he "didn't put a whole lot of stock" in it, nor did he believe that the report foreshadowed the closing of the Summit Hotel. (*Tr.* 97–98, 103–06).

One week later, on June 26, 1990, Burke sent a letter to George Lee of Colonial Realty, Inc., which sought "input from ownership regarding how you wish us to handle" negotiations with the plaintiff union. (Jt. Exh. 19). This letter further indicated that "[t]he current cash crisis grows larger and more difficulty every day" and that pending and threatened judicial actions by creditors "will force us to cease operating as we will no longer be able to buy food or fund payroll." (*Id.*) Burke testified that at the time he wrote this letter, he did not envision that the hotel would close. (*Tr.* 60, 97).

On July 6, 1990, a meeting was attended by Henry Tamarin and Connie Holt for Local 217, Lobo and Burke for MHM, and Preston Harding, Marc Olins, and Bruce Linton for Colonial Realty. (Jt. Exh. 58, ¶ 12, D's Exh. A; Tr. 171–72, 174–76, 178–79, 180, *Tr.* 50–55, 73–74). This meeting provided the first opportunity for representatives of the union to meet with representatives from Colonial Realty. (Tr. 172, 174–76, *Tr.* 125–26). This meeting did not constitute a formal negotiating session, but instead consisted of a general discussion of the economy and its impact upon the hotel's financial condition, as well as of the union's position in the upcoming contract negotiations. (Tr. 178, *Tr.* 51–52, 53–54, 73–74). Holt described this meeting as a "chit chat," the purpose of which was to solicit "creative ideas" in improving the hotel's operation. (Tr. 178–79, 180). Upon questioning by Tamarin, representatives of Colonial Realty indicated that they were "very concerned" about the hotel but that closing it was "only a doomsday approach." (D's Exh. A; *Tr.* 54).

---

**8.** Dennis Cahill, a Sales Manager in BC & BS' Hartford office who oversaw the insurance for the Summit Hotel and who was subpoenaed by both sides (Tr. 29–31), explained that BC & BS' only responsibility under an ASO contract is to administer and process the claims and that payment for such claims would come from a bank account the plan sponsor would create for that purpose. (Tr. 46–51). A bank account in Texas was established by MHM, as "Agent for Summit Hotel" for that purpose. (Jt. Exh. 49; Jt. Exh. 58, ¶ 10; Tr. 75–78). Cahill analogized an ASO agreement to a checking account—if there are insufficient funds in the account, there is no insurance coverage. (Tr. 32–33, 66–67).

The first negotiating session was held on July 16, 1990, attended only by representatives of Local 217 and MHM, at which the union presented a two-page summary of its demands. (Jt. Exh. 20, Jt. Exh. 58, ¶ 14; Tr. 181–83, *Tr.* 74–75). No representatives of Colonial Realty were present because they had failed to provide Burke with any "feedback" as to how the negotiations should proceed. (Jt. Exh. 58, ¶ 14; *Tr.* 98–99). A copy of the two-page summary was forwarded to Linton by MHM on July 25, 1990; this letter further indicated that the next negotiating session was scheduled for August 16, 1990. (Jt. Exh. 21).

A meeting was held on July 30, 1990 at Colonial Realty's office, which was attended by Googel, Sisti and Jerry Brophy from CCELP, and by Burke and William Kidwell from MHM. (Jt. Exh. 58, ¶ 16; Tr. 227–29, *Tr.* 32). It was at this meeting that CCELP instructed MHM to close the hotel within sixty to ninety days, the original concept being that such a time period would comply with applicable law. (Tr. 229–30, *Tr.* 69–70). Burke testified that despite the hotel's precarious financial state, he had not expected this decision. (*Tr.* 32, 36–37). Burke further testified that he did not consider Googel and Sisti's decision to close the hotel to be a "final one," as they had elicited additional information from MHM, including detailed information regarding reservations. (*Tr.* 37–38). On August 2, 1990, Burke forwarded a letter to Sisti, which letter sought guidance as to details for closing and included a proposed draft press release for an anticipated closing on Sunday, October 7, 1990. (Jt. Exh. 59; *Tr.* 38–41, 43–44). Four days later, on August 6, 1990, Lobo sent Sisti a seven-page letter, with six attachments, which provided specific information on the hotel's operations for the past four months. (Jt. Exh. 60; *Tr.* 41–42). Attachments 1 and 2 included proposals and forecasts for 1991; Burke testified that at that point, ". . . we were still trying to convince them to keep the hotel open and provide them some light at the end of the tunnel . . ." (*Tr.* 42). These efforts were in vain, however, for "within a few days" of the July 30th meeting, Googel, Sisti, Shuch and Can-

delori, after "extensive conversations," decided to close the hotel immediately, as the financial burden to pay the employees what was due to them was less than the expense of keeping the hotel open for the summer months. (Tr. 230–31, 234–36, 238–39).

On Monday, August 6, 1990, Lobo was informed that CCELP wanted to close the hotel by Friday, August 10, 1990, a decision about which Burke felt "first . . . shock and then disappointment." (*Tr.* 44). The next day, on Tuesday, August 7, 1990, Lobo, as the hotel's General Manager, sent out, on Summit Hotel stationery, the requisite Notices of Closing to Holt, employees, and designated local and state officials; these notices were drafted by an attorney for Colonial Realty. (Jt. Exhs. 2, 22, Jt. Exh. 58, ¶ 17; *Tr.* 70–73, 99). Lobo's cover letter to Holt closed as follows:

> The employer will continue to pay employee wages and salaries, and will continue any employer contributions to employee benefit plans for a period not to exceed 60 days. Further, the employer will continue to provide health insurance continuation consistent with the requirements of State and Federal law.

(Jt. Exh. 2). Lobo also met with employees, without any representatives from CCELP present. (*Tr.* 71–73). Although the decision to close the Summit Hotel was made solely by CCELP about which MHM had "absolutely no[ ]" control (*Tr.* 99; *see also* Jt. Exh. 58, ¶ 29), MHM did the "dirty work" in implementing that decision. (*Tr.* 71). Like the pay checks, the severance checks were processed through MHM's payroll department in Texas. (Jt. Exh. 7; *Tr.* 73).

On Friday, August 10, 1990, the day the Summit Hotel closed, MHM and CCELP entered into a two-page letter agreement which further modified the existing management agreement between the parties, "due to the decision of [CCELP] to cease operation of The Summit Hotel." (Jt. Exh. 24). This agreement set forth MHM's responsibilities for the sixty day period between August 10, 1990 and October 8, 1990 for the "orderly shutdown of the business." (*Id.*) With respect to employment

matters, MHM agreed to "supervise and only process weekly payroll for the terminated employees until no longer required or until funds to cover said payroll are not forthcoming." (*Id.* ¶ 1). The agreement further provided:

> MHM, Inc. will assist as necessary or required by [CCELP] in the union negotiation that is required to negotiate the effects of the closing.

> It is also expressly understood that nothing in our current agreement or in this modification creates on the part of MHM, Inc. any liability for the payment of severance or benefit costs committed to by [CCELP].

(*Id.* ¶ 6). Copies of this agreement were forwarded only to other representatives of MHM.

That same day, Tamarin sent a letter to Lobo in which he advised that Local 217 wished to commence negotiations on the impact of the hotel's closing. (Jt. Exh. 23). He further confirmed his understanding of the "hotel's position" to provide severance of sixty days' wages and benefits and an additional ninety days of insurance coverage thereafter. (*Id.*) The letter further advised that a meeting was scheduled for Tuesday, August 14, 1990 and urged that MHM "make every effort to have a representative of Colonial present." (*Id.*) A copy of this letter was forwarded to Harding of Colonial Realty. (*Id.*) On Monday, August 13, 1990, Burke also sent a copy of this letter to Lee at Colonial Realty. (Jt. Exh. 25). Three "effects bargaining" sessions were held in August and September, which were attended by Lobo on behalf of MHM, by Holt on the union's behalf, and by Lee and an attorney for CCELP. (Jt. Exh. 58, ¶ 21; Tr. 176–77, 179–80, 184, *Tr.* 126–28). Holt testified that it was necessary to have Colonial Realty participate in these discussions, since its decision to close the hotel had an impact on the hotel's employees. (*Tr.* 127–28). During this time frame, the principals of Colonial Realty Company and Colonial Realty/USA Corp., specifically Googel and Sisti, continued to provide the funds necessary to make these severance payments. (Jt. Exh. 58, ¶ 22; Tr. 236–38, *Tr.* 44–45, 47–48). In September, a comprehensive agreement was reached with CCELP, with respect to wages, insurance, pension, vacation and sick day payments; although Tamarin memorialized this agreement in writing, no contract ever was executed in light of the involuntary bankruptcy petition which was filed against Colonial Realty Co. and its principals in early September 1990. (Tr. 184–90).[9] After the involuntary bankruptcy petitions were filed, Googel and Sisti stopped making the severance payments as well. (Jt. Exh. 58, ¶ 22; Tr. 236–38, *Tr.* 45, 47–48, 117–18).

On Monday, August 13, 1990, Lobo sent a letter to BC & BS, on Summit Hotel letterhead, which informed the insurance company of the August 10th closing and which indicated that "Colonial Realty, which owns the hotel, has informed me that it wishes to continue the existing policy with Blue Cross for 150 days from August 10, 1990." (Jt. Exh. 33). The letter continued that Colonial Realty had informed Lobo that it will continue funding the insurance with approximately $50,000 per month. (*Id.*) Cahill testified that upon receipt of this letter, he learned for the first time that CCELP was the owner of the Summit Hotel. (Tr. 53–56, 81–82). A corrected letter was sent by Lobo on August 29, 1990, which indicated that Colonial Realty wished to continue the existing insurance policy "for a minimum of 150 days from August 10, 1990." (Jt. Exh. 34. *See also* Jt. Exh. 35). In early September 1990, two checks which had been placed in the insurance account, totalling $20,338.52, had bounced, so that on September 18, 1990, BC & BS sent a letter to Colonial Realty in which it terminated the ASO agreement. (Jt. Exhs. 3, 36, 40, 37–39, 42; Tr. 34–35, 54–55, 60, 74–78, 94–101, 223–24, 225, 226–27). An internal BC & BS memorandum, dated November 12, 1990, indicated that the insurance company would be offering

---

**9.** Burke denies that any final agreement was reached between Local 217 and Colonial Realty.

(Jt. Exh. 58, ¶ 21).

former Summit Hotel employees a "Direct Pay Plan". (Jt. Exh. 41; Tr. 88–92). By this time, the total debt to BC & BS was $101,215.81. (*Id.;* Tr. 74). Claims submitted after that date by individuals formerly employed at the Summit Hotel were rejected by BC & BS. (*See e.g.,* Jt. Exh. 6, Jt. Exh. 54, ¶ 5; Jt. Exh. 55, ¶¶ 4–8; Tr. 60, 242–44, *Tr.* 12–14).

On or about November 21, 1990, BC & BS forwarded undated letters to former Summit Hotel employees which provided in pertinent part:

> Now that your Blue Cross & Blue Shield coverage is no longer being paid through your employer's group, we are offering you the opportunity to continue your group coverage for the period shown on the enclosed notice and then to convert your coverage to our direct payment plan.
>
> The enclosed notice represents the amount you must pay if you wish to continue your coverage. If you received Blue Cross & Blue Shield dental coverage or major medical coverage through your employer's group, you are no longer eligible for those coverages and the charges are not included on this notice. The direct payment plan does not necessarily offer the same combination of benefits you may have received through your employer's group. . . .

(Jt. Exhs. 8, 29, Jt. Exh. 53, ¶¶ 4–6, Jt. Exh. 57, ¶ 4; Ps' Exhs. 1A & 1B; Tr. 114–17, 141–44, 206–10). The attached notices listed the amount of the premium and also indicated that the period covered was from September 18, 1990 through December 31, 1990, with the payment due on November 21, 1990. (Jt. Exh. 8; Ps' Exh. 1B). This letter and notice were the only communications plaintiffs received from MHM or BC & BS with respect to medical insurance. (Jt. Exh. 53, ¶ 4, Jt. Exh. 57, ¶ 3; Tr. 119). Cahill agreed that the direct payment plan provided less insurance coverage to the employees than did the ASO plan, and thus it was his understanding that such plan did not constitute an offer of continued benefits under COBRA. (Tr. 57–60, 82, 83, 84–87, 102–102–09). All of the plaintiffs who

testified rejected BC & BS' offer for a variety of reasons, including lack of funds due to unemployment, financial inability to pay premiums on a quarterly (as opposed to monthly) basis, refusal to pay three months' premiums for one month's coverage, perception that the new insurance would not cover preexisting conditions, and obtaining insurance through a new employer. (Jt. Exh. 53, ¶¶ 4–6, Jt. Exh. 54, ¶¶ 6–9, Jt. Exh. 56, ¶ 7, Jt. Exhs. 57, ¶ 5; Tr. 124–25, 126–28, 130–33, 136, 138, 144–47, 210–13, 244–46, *Tr.* 18–21, 23–26). Plaintiff Grilli is suffering from a painful hernia which requires surgical correction, but he cannot afford surgery without health insurance. (Jt. Exh. 56, ¶¶ 4–6). Although plaintiff Jean has had recurrences of skin cancer, he has not sought medical care because he no longer has health insurance. (Jt. Exh. 54, ¶ 9).

On September 12, 1990, the Unemployment Compensation Division of the State of Connecticut Department of Labor issued a decision disqualifying unemployment compensation claims, which was followed by a corrected decision issued on October 2, 1990. (Jt. Exh. 30, Jt. Exh. 58, ¶ 28; *Tr.* 113–18). The corrected decision held that payment of unemployment benefits was to commence on September 9, 1990, since salary continuation under WARN had been suspended due to Colonial Realty's bankruptcy. (Jt. Exh. 30).

On September 28, 1990, Local 217 submitted a grievance to MHM with respect to the failure to provide insurance benefits. (Jt. Exh. 26; Tr. 158–60). On October 3, 1990, MHM responded in a letter to Local 217 which indicated that the union's grievance had been forwarded to CCELP, which "is the appropriate party to receive and negotiate the grievance." (Jt. Exh. 27). This letter continued:

> As you are well aware, MHM, Inc. has no financial or any other equity interest in the ownership of the Summit Hotel. Our relationship with the owner, [CCELP], through Colonial Realty is one of agency and we have merely acted on their behalf.

(*Id.*) Holt and Local 217 perceived this response as a denial of the grievance. (Tr. 160–61, 161–63, 165). Holt testified this was the first time MHM had denied being the "employer" of those who worked in the Summit Hotel. (Tr. 163). Burke agreed that in no other instance did MHM deny that it was the "employer" for purposes of processing grievances. (*Tr.* 93–94). On October 17, 1990, Local 217 forwarded a letter to MHM which read in full:

> The Union's position is that MHM is the Employer under the terms of our collective bargaining Agreement. We are therefore amending our earlier grievance for the Employer's failure to make pension contributions since May, 1990 and also its failure to pay accrued vacation pay.

(Jt. Exh. 28. *See also* Tr. 166–71). As previously stated, this lawsuit was filed on December 18, 1990; plaintiffs' motion for preliminary injunction was filed the next day. Holt testified that Local 217 chose to pursue its remedies in federal court because the arbitration process can be very sluggish. (Tr. 196–98).[10] On January 7, 1991, Local 217 commenced an arbitration against MHM before the Connecticut State Board of Arbitration, with respect to wages, insurance coverage, pension contributions, accrued sick days, and vacation pay. (Jt. Exh. 52. *See also* Tr. 169–71, 198).[11] At no time did MHM discourage Local 217 from commencing this arbitration. (Tr. 157–58).

## II. DISCUSSION

In their motion for preliminary injunction, plaintiffs ask this Court to enjoin de-

fendant MHM from refusing to provide 26 days of health insurance under the Collective Bargaining Agreement,[12] from refusing to provide an additional 57 days of health insurance under WARN, 29 U.S.C. § 2104,[13] and from refusing to provide the continuation of their insurance at the group rate after expiration of the 83 days described above, under COBRA, 29 U.S.C. § 1161 *et seq.*

## A. STANDARDS FOR PRELIMINARY INJUNCTIONS

As the Second Circuit observed last year:

> It is well established in this Circuit that party seeking an preliminary injunction must show that it is likely to suffer possible irreparable injury if the injunction is not granted and "either (1) likelihood of success on the merits of its case or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor." ...

*Reuters Ltd. v. United Press Int'l, Inc.,* 903 F.2d 904, 907 (2d Cir.1990) (multiple citations omitted). *See also Paulsen v. County of Nassau,* 925 F.2d 65, at 68 (2d Cir.1991); *Tsokalas v. Purtill,* 756 F.Supp. 89, 92 (D.Conn.1991); *UAW, AFL–CIO v. Cowen,* Civ. No. H90–588(TEC) (D.Conn. Nov. 30, 1990), slip op. at 5–6; *Guitard v. United States,* Civ. No. H90–323(AHN) (D.Conn. Nov. 5, 1990), slip op. at 4; *Westinghouse Electric Corp. v. Bank of Boston Connecticut,* Civ. No. N90–430(TFGD) (D.Conn. Sept. 21, 1989), slip op. at 4; *Architectural Eagle Wood Windows of Connecticut, Inc. v. Eagle Window & Door,*

---

10. *See* note 11 *infra.*

11. Jt. Exh. 52 consists of a compilation of letters, from January 7, 1991 until January 25, 1991. As these letters indicate, Local 217 requested that this arbitration be held on an "expedited" basis, to which MHM objected, because there are no written briefs or decision in an "expedited arbitration," which is decided by a sole arbitrator. Although MHM has reserved its right to contest the arbitrability of this matter, it has agreed that this matter can be heard by the Connecticut State Board of Mediation and Arbitration on an accelerated basis. (*See also* Tr. 198–99, 200–01). By letter, dated March 20,

1991, however, the Connecticut State Board denied plaintiffs' request for the case to be "taken out of chronological order...." (*See* Letter of Plaintiffs' Counsel, dated March 29, 1991).

12. As plaintiffs explain on pp. 43–44 of Dkt. # 45, the 26–day period runs from September 3, 1990 until September 30, 1990, when the Collective Bargaining Agreement expired.

13. Because plaintiffs only received three days' notice of the closing (from August 7, 1990 to August 10, 1990), they claim they were entitled to an additional 57 days under WARN. *See* note 12 *supra.*

*Inc.,* Civ. No. B90–144(TFGD) (D.Conn. Sept. 17, 1990), slip op. at 3; *Bartalotta v. Otay Mesa Land Partners,* Civ. No. H90–399(PCD) (D.Conn. July 2, 1990), slip op. at 5.

### 1. Irreparable Harm

■ As the Second Circuit continued in *Reuters, supra:*

> Because a showing of probable irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction," ... the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered. Irreparable harm must be shown by the moving party to be imminent, not remote or speculative, ... and the alleged injury must be one incapable of being fully remedied by monetary damages....

903 F.2d at 907 (multiple citations omitted). *See also Paulsen, supra,* 925 F.2d 65, at 68; *Abish v. Northwestern National Ins. Co.,* 924 F.2d 448, 453–54 (2d Cir.1991).

Irreparable harm "is the sine qua non for the grant of such equitable relief." *Guitard, supra,* slip op. at 4–5 (citation omitted).

As the Second Circuit held twelve years ago, "... the threatened termination of benefits such as medical coverage for workers and their families obviously raised the spectre of irreparable injury." *Whelan v. Colgan,* 602 F.2d 1060, 1062 (2d Cir. 1979). Just last year, the Second Circuit similarly found that the threat of termination of medical benefits to striking workers constituted irreparable harm. *Communication Workers of America, District 1, AFL–CIO v. NYNEX Corp.,* 898 F.2d 887, 891 (2d Cir.1990) ["NYNEX"]. *See also International Union, United Automobile, Aerospace & Agricultural Implement Workers of America, U.A.W. v. Exide Corp.,* 688 F.Supp. 174, 186–87 (E.D.Pa.), *aff'd mem.,* 857 F.2d 1464 (3d Cir.1988) ["Exide"]; *Mamula v. Satralloy, Inc.,* 578 F.Supp. 563, 577 (S.D. Ohio 1983).[14] *But see United Electrical, Radio & Machine*

---

**14.** As the *Mamula* decision so poignantly observed:

> The injury to the plaintiffs, here, is not merely monetary. The plaintiffs are not now covered by the group insurance plan because of its termination by defendant. Despite the opportunity to convert their group coverage to individual policies, many of the plaintiffs were not able financially to afford to convert their policies or, at best, they were able to convert only part of the coverage. To presume that one not able to afford health insurance coverage is harmed only in a monetary sense is to ignore the realities of the situation.... The adequacy of a monetary award to a person unable to afford health insurance coverage rests on the assumption that the person will seek and obtain necessary medical care, will pay for the medical care received at that time, and will simply be recompensed later by the defendant when a judgment is rendered against it.
>
> Such an assumption could have some validity if the costs of medical services and hospitalization in today's society were well within the financial reach of the average worker. In reality, they are not. It is an unfortunate but true fact of life today that health care costs have skyrocketed to the point where health care insurance is virtually a necessity for persons of modest incomes if needed medical attention is to be obtained. Indeed, it is not unusual for a provider of major medical care—often the most needed care—to require evidence of insurance in advance of delivery

of medical or hospital care. It is largely because health care costs have reached such heights that provisions in collective bargaining contracts requiring the employer to pay the cost of the premiums have become so important to employees and, as a result of increasingly higher premium costs, an ever larger financial burden to the employer. It is a utopian notion that all working men and women or retirees can well afford, without insurance, the cost of essential medical services today or that, if they cannot afford them, those services will always be provided to them.... Being denied today's passport to the doctor's office and hospital—the health insurance card—which the employer promised under the collective bargaining agreement, results in harm that is not readily measurable but is clearly present. The ultimate effects of delay in obtaining medical attention or of not receiving any medical attention, or of purchasing inadequate medical coverage are all incapable of being easily measured. The harm, difficult to assess in monetary terms but real to the plaintiffs, cannot be adequately compensated by some judgment for damages awarded many months or even years after the termination of the plan occurred.

If anything, the situation has worsened since the *Mamula* opinion was written more than seven years ago.

*Workers of America, Local 296 v. Stone Safety Corp.,* Civ. No. N88–423(WWE) (D.Conn. Oct. 25, 1988) [*"Stone Safety"*], slip op. at 7–10 (finding no "irreparable injury" to 70 employees facing lay off by financially solvent employer, of whom a substantial number were "threatened with ... the prospect of losing their health insurance coverage") (distinguishing *Exide* ).

Defendant MHM argues that the *Whelan* and *NYNEX* decisions are inapposite, as they involved affirmative actions by the defendants-employers to terminate employees' health benefits and did not concern the specific federal statutes at issue here. For purposes of an irreparable harm analysis, these distinctions are irrelevant, for it is the impact upon the plaintiffs which must be considered. At least two of the plaintiffs—Grilli and Jean—are foregoing medical care for want of health insurance; Grilli has postponed surgery for a painful hernia and Jean has not sought medical scrutiny which might prevent a potentially life-threatening recurrence of skin cancer. There is little doubt that plaintiffs have satisfied this first hurdle.

### 2. Likelihood of Success on the Merits

■ A party seeking injunctive relief under this prong

> ... need not show that success is an absolute certainty. He need only make a showing that the probability of his prevailing is better than fifty percent. There may remain considerable room for doubt....

*Abdul Wali v. Coughlin,* 754 F.2d 1015, 1025 (2d Cir.1985). Such standard applies only when the relief sought is "prohibitory," *i.e.,* where "the purpose of the preliminary injunction is to maintain the *status quo ante* pending a full hearing on the merits." *Id.* (citation omitted). A "greater showing is required of the moving party" when the relief sought is "mandatory," where "the grant of injunctive relief will change the positions of the parties as it existed prior to the grant." *Id.* As the Second Circuit acknowledged,

> The distinction between mandatory and prohibitory injunctions, however, cannot be drawn simply by reference to whether or not the *status quo* is to be maintained or upset. As suggested by the terminology used to describe them, these equitable cousins have been differentiated by examining whether the non-moving party is being ordered to perform an act, or refrain from performing. In many instances, this distinction is more semantical than substantive. For to order a party to refrain from performing a given act is to limit his ability to perform any alternative act; similarly, an order to perform in a particular manner may be tantamount to a proscription against performing in any other.

*Id.* at 1025–26. For mandatory relief,

> ... we have held that an injunction should issue "only upon a clear showing that the moving party is entitled to the relief requested ..." or where "extreme or very serious damage will result" from a denial of preliminary relief.... In sum, we have shown "greater reluctance to issue a mandatory injunction than a prohibitory injunction." ...

*Id.* (multiple citations omitted). *Compare Westinghouse Electric, supra,* slip op. at 1–6 (relief sought to require secured creditor to relinquish documents, materials and equipment so that plaintiff can turn to other suppliers to complete work at dispute is prohibitory rather than mandatory) *with Artemisia Holdings, Inc. v. Connecticut Bancorp., Inc.,* Civ. No. B89–510(TFGD) (D.Conn. Oct. 2, 1989), slip op. at 1–5 (in securities fraud action, plaintiffs' request to postpone date of annual shareholders' meeting is mandatory, not prohibitory); *Stellmaker v. Depetrillo,* Civ. No. H88–542(PCD) (D. Conn. Aug. 30, 1988), slip op. at 13–15 (teacher's request to preclude his transfer to a new school and to reinstate him in his former job is mandatory, as the relief sought "would roll the clock back ...").

Not unexpectedly, the parties disagree as to whether the relief sought here by plaintiffs is prohibitory or mandatory. Deciding into which category this motion falls is not a mere academic exercise, for this is one of those rare instances where the standard to

be applied has some impact upon the result reached. Despite the closure of the Summit Hotel on August 10, 1990, plaintiffs had no legitimate concerns about the payment of wages and benefits, as the owners of the hotel continued to fund a severance program, which program was administered by MHM. For purposes of this motion for preliminary injunction, several critical events transpired during the autumn of 1990, the first of which was the filing of the involuntary bankruptcy petitions against Colonial Realty and its principals in early September 1990. The second critical event was BC & BS' termination of the ASO agreement, on September 18, 1990, about which plaintiffs apparently received no immediate notice. The third crucial sequence of events was the exchange of letters between Local 217 and MHM with respect to the grievance, from September 28, 1990 until October 17, 1990. And the last critical event was receipt by plaintiffs of BC & BS' notice, shortly after November 21, 1990. The motion for preliminary injunction was filed on December 19, 1990. Like the transferred teacher in *Stellmaker, supra*, plaintiffs here *are* asking this Court to "roll the clock back," to return the parties to early September 1990, before BC & BS terminated the ASO agreement. If plaintiffs were asking the Court to *extend* rather than *reinstate* their health insurance, the relief sought would be prohibitory in nature; given the sequence of events described above, the Court must conclude that the injunctive relief requested is mandatory, not prohibitory.[15]

## B. APPLICATION OF STANDARDS TO PLAINTIFFS' CLAIMS

### 1. LMRA Claims

The Collective Bargaining Agreement which forms the basis of plaintiffs' claims under § 301 of LMRA, 29 U.S.C. § 185, provides that in a "grievance pertaining to the interpretation or application of this Agreement," any party to the agreement "may appeal [the grievance] in writ-

ing to the Connecticut State Board of Mediation and Arbitration" within forty days. (Jt. Exh. 1, § 27.1). The arbitrator's decision "shall be final and binding upon both parties." (*Id.*, § 27.4). After the commencement of this lawsuit, on January 7, 1991, Local 217 commenced an arbitration against MHM before the Connecticut State Board of Arbitration. (Jt. Exh. 52; *Tr.* 198–99, 200–01). MHM has reserved its right to contest the arbitrability of this matter. (Jt. Exh. 52). MHM's only argument with respect to plaintiffs' LMRA claims is that this court lacks jurisdiction because plaintiffs failed to exhaust their administrative remedies prior to commencing this suit.

A federal court's authority to issue preliminary injunctions in labor cases is limited by virtue of the Norris–LaGuardia Act, as amended, 29 U.S.C. §§ 101–15 ["NLGA"]. Section 101 provides in pertinent part:

> No court of the United States ... shall have jurisdiction to issue any ... temporary ... injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this chapter ...

Further substantive and procedural constraints are found in §§ 104, 105, 107, 108, and 109. Of particular significance here is § 108, which provides:

> No ... injunctive relief shall be granted to any complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of available governmental machinery of mediation or voluntary arbitration.

As one district judge explained just a few months ago,

> The NLGA was enacted in 1932 with the specific and limited purpose of divesting federal courts of jurisdiction to issue injunctions in labor disputes.... Con-

---

**15.** There is precious little that plaintiffs could have done to prevent this conclusion, for they apparently lacked immediate knowledge of the actions taken by BC & BS on September 18,

1990. Once they received notice from BC & BS in late November 1990, their comprehensive complaint and motion were filed shortly thereafter.

gress concluded that the federal judiciary was abusing its equity powers and, often on an ex parte basis, issued injunctions that inhibited lawful labor union activities.... To remedy this perceived problem the legislature sent a strict and clear message to the courts.... In the ensuing years the courts have continually followed the language of the NLGA.... There are few cases where the courts have made exceptions....

Although the NLGA anti-injunction mandate is not absolute, it prescribes certain procedural requirements that must be followed before a party can successfully pursue equity relief in a federal court....

*International Ass'n of Machinists & Aerospace Workers, AFL–CIO v. Eastern Air Lines, Inc.*, 121 B.R. 428, 434 (S.D.N.Y. 1990), (multiple citations & footnote omitted), *aff'd per curiam*, 923 F.2d 26 (2d Cir.1991) [*"Eastern"*].

As indicated by the court in *Eastern*, the seminal case with respect to § 108 is *Brotherhood of Railroad Trainmen, Enterprise Lodge, No. 27 v. Toledo, Peoria & Western Railroad*, 321 U.S. 50, 64 S.Ct. 413, 88 L.Ed. 534 (1944) [*"Toledo"*]. In *Toledo*, the railroad's employees engaged in a strike, in which there were a number of acts of violence, after a year of unsuccessful negotiations and after both sides refused to submit the disputes to arbitration. The district court granted the railroad's application for a temporary injunction against the union, which was upheld on appeal. In reversing, the Supreme Court observed that NLGA "sought to make injunction a last line of defense, available not only after other legally required methods, but after all reasonable methods as well, have been tried and found wanting." *Id.* at 58–59, 64 S.Ct. at 417–418. The "over-all policy" of NLGA "was to encourage use of the nonjudicial processes of negotiation, mediation and arbitration for the adjustment of labor disputes." *Id.* at 58, 64 S.Ct. at 417 (citations omitted). During legislative debate, § 108 was described as "the 'clean hands' provision." *Id.* at 60, 64 S.Ct. at 418 (citation omitted). While the Court emphasized that arbitra-

tion was "voluntary," *id.* at 62, 64 S.Ct. at 419, by circumventing that option, a party waives its opportunity to obtain equitable relief:

[A party] is free to arbitrate or not, as it chooses. But if it refuses, it loses the legal right to have an injunction issued by a federal court or, to put the matter more accurately, it fails to perfect the right to such relief. This is not compulsory arbitration. It is compulsory choice between the right to decline arbitration and the right to have the aid of equity in a federal court.

*Id.* at 63, 64 S.Ct. at 420. Thus, the remedies with which the railroad was left were damages suits and criminal prosecutions. *Id.*

The *Eastern* decision recognized that there are "few" exceptions to NLGA, 121 B.R. 428, at 434 n. 9, the most noted of which is *Boys Markets, Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), in which the parties were bound by a mandatory arbitration clause in the disputed collective bargaining agreement. After the union initiated a strike, the employer obtained an injunction, first in state court and then in federal court, which enjoined the strike and compelled the union to arbitrate. The Ninth Circuit reversed the injunction, under NLGA; the U.S. Supreme Court, in turn, reversed the Court of Appeals. In *Boys Markets*, the Supreme Court set forth "the correct principles concerning the accommodation necessary between the seemingly absolute terms of [NLGA] and the policy considerations underlying § 301(a)." *Id.* at 249, 90 S.Ct. at 1591 (footnote omitted). The Court reviewed the historical context in which NLGA was enacted and found that the situation then was "totally different from that which exists today." *Id.* at 250, 90 S.Ct. at 1592. The Court thus held as follows:

We conclude, therefore, that the unavailability of equitable relief in the arbitration context presents a serious impediment to the congressional policy favoring the voluntary establishment of a mechanism for the peaceful resolution of labor

disputes, that the core purpose of [NLGA] is not sacrificed by the limited use of equitable remedies to further this important policy, and consequently that [NLGA] does not bar the granting of injunctive relief in the circumstances of the instant case.

... Our holding in the present case is a narrow one. We do not undermine the vitality of [NLGA]. We deal only with the situation in which a collective-bargaining contract contains a mandatory grievance adjustment or arbitration procedure. Nor does it follow from what we have said that injunctive relief is appropriate as a matter of course in every case of a strike over an arbitrable grievance....

*Id.* at 253–54, 90 S.Ct. at 1593–94.

In subsequent labor cases in which a party requests equitable relief, federal courts must decide whether to follow the general prohibition described in *Toledo* or whether the situation falls within the narrow exception described in *Boys Markets*. For example, in the collective bargaining agreement at issue in *United Parcel Service (New York), Inc. v. Local 804, Int'l Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America,* 698 F.2d 100 (2d Cir.1983) [*"UPS"*], the union agreed not to engage in any strikes so long as UPS abided by the grievance and arbitration procedures established in the agreement and similarly, UPS agreed that there would be no "lockouts" so long as the union abided by these same procedures. After the union engaged in six work stoppages, UPS commenced a lawsuit, in which it obtained a preliminary injunction against the union's activities. Upon appeal, the union argued that the injunction was in violation of NLGA and *Boys Markets,* as UPS had failed to demand arbitration prior to commencing the lawsuit. As the Second Circuit recognized, arbitration is not a rapid process:

Most arbitration machinery is not suited to expedited resolution of disputes.... Thus, invoking the arbitral process before obtaining a *Boys Markets* injunction would not obviate the court's need to engage in a preliminary interpre-

tation of the contract.... Normally, only after injunctive relief has been obtained will the arbitrator hear the case....

*Id.* at 104 n. 7. The Second Circuit rejected what it described as the union's "strained reading" of *Boys Markets, id.* at 104:

We hold ... that "every reasonable effort" to resolve a dispute through non-judicial means does not necessarily include a prior demand for arbitration. In view of the lengthy arbitration process, little if anything can be gained by demanding arbitration when confronted with an ongoing strike. Despite the demand, a federal court nevertheless may grant temporary injunctive relief as well as render a decision on the merits under *Boys Markets* well before the arbitrator can decide the case. An employer's failure to demand arbitration, therefore, does not necessarily tip the equitable scales so as to preclude a claim for injunctive relief. As long as a demand for arbitration has little chance of inducing settlement of the dispute before entry of a *Boys Markets* injunction, the "clean hands" provision does not require the formality of demanding arbitration on the way to the courthouse door.

*Id.* at 106. In this particular case, however, a demand for arbitration would not have been "a mere formality," in that there was an explicit provision in the collective bargaining agreement under which either party could demand an "immediate arbitration" for an alleged violation of the no-strike clause. *Id.* at 106–07. The import of this clause was that

... it clearly envisages a prompt, effective extrajudicial means of resolving alleged breaches of the no-strike clause. Submission to the expedited arbitration procedure could have obviated the need for a *Boys Markets* injunction.... [B]y utilizing the expedited arbitration procedure, the employer might have been able to obtain relief equivalent to that available through a *Boys Markets* injunction. Thus, utilizing the expedited procedure in such situation should be viewed as part of the required "reasonable effort" to

resolve the dispute through extrajudicial means....

*Id.* at 107 (citations omitted). The preliminary injunction thus was vacated and the matter remanded back to the district court for further development on the record as to how effective the expedited arbitration would be in providing an "immediate, effective remedy." *Id.* at 108–09. *See also Eastern, supra,* 121 B.R. 428, at 434–438 (Eastern barred from seeking injunctive relief against union's violence by failing to seek arbitration first).

The analysis applied in *UPS* appears appropriate here. The last correspondence between Local 217 and MHM took place on October 17, 1990 (Jt. Exh. 28), to which MHM apparently never responded. Had the union initiated the arbitration process within a reasonable period of time thereafter, it is not inconceivable that an arbitration decision would have been rendered by now. As in *UPS,* Local 217 might well have been able to obtain through "a prompt, effective extrajudicial means" the very relief which it seeks here.

A corollary doctrine which plaintiffs seek to apply is an "injunction in aid of arbitration." Such an injunction was at issue in *American Postal Workers Union, AFL-CIO v. United States Postal Service,* 766 F.2d 715 (2d Cir.1985), *cert. denied,* 475 U.S. 1046, 106 S.Ct. 1262, 89 L.Ed.2d 572 (1986) ["*USPS*"], where the district court had granted the postal union's motion for preliminary injunction to stay its president's discharge pending the outcome of the grievance and arbitration procedure. In this context, besides the traditional requirements for a preliminary injunction, *see* Section II.A. *supra,* the union also needed to demonstrate "that the injunction was necessary to preserve the jurisdiction of the arbitrator or as an aid to arbitration." 766 F.2d at 722 (citation omitted). Such an injunction is necessary to prevent a favorable award from an arbitrator from becoming "but an empty victory." *Id.* (citations omitted). In reversing the district court, the Second Circuit held that an injunction "to aid the arbitral process" was not neces-

sary for if this employee's discharge were ultimately deemed to have been without cause, he could be reinstated with full pay. *Id.* at 723. The passage of time works to plaintiffs' disadvantage with respect to this doctrine as well. As discussed in Section II.A.2. *supra,* in their requested preliminary injunction, plaintiffs seek not to preserve the status quo, but to resurrect their medical insurance coverage. The relief requested here would not be in "aid" of the arbitration, but essentially would be in lieu of it; plaintiffs do not merely ask the court to extend its "holding pattern" but to re-create one.

Plaintiffs rely upon *Exide, supra,* a case in which the factual situation is somewhat parallel to that here. *But see Stone Safety, supra,* slip op. at 9–10 (questioning *Exide* decision). In *Exide,* the plaintiff union and defendant employer had been engaged in three months of negotiations with respect to the employer's proposal to dramatically reduce medical benefits. Once an impasse was reached, Exide gave the union only three days warning that it would unilaterally implement the new health plan, as of April 1, 1988. On April 13, 1988, the union filed its grievance; the employer refused the union's request to expedite the grievance and arbitration process and to refrain from implementing these changes until a decision had been issued. Six days later, the union commenced this lawsuit. An evidentiary hearing was held one month later, following which the union's motion for preliminary injunction was granted. The court found that Exide's refusal to arbitrate "interfered with and frustrated the arbitration process." *Id.* at 186. It further found that Exide's actions would render an arbitrator's award a "hollow formality" because "when rendered it could not return the parties substantially to the *status quo ante.*" *Id.* (citations omitted). Unlike *Exide,* however, defendant MHM has *not* refused to arbitrate the matter—if that were the case, the equities might well tip in plaintiffs' favor. Here, MHM, outside of refusing to proceed on an expedited basis,[16] which is not an unreasonable posi-

---

**16.** *See* note 11 *supra.*

tion given the significant issues here, has not taken any steps to "interfere[ ] or frustrate[ ] the arbitration process."

For these reasons, plaintiffs are not entitled to a preliminary injunction with respect to their claims under LMRA.

### 2. Warn Claims

 The key threshold issue at dispute is whether MHM is the plaintiffs' "employer" for purposes of WARN.[17] The WARN statute, which contains only nine sections, 29 U.S.C. §§ 2101–09, went into effect on February 4, 1989. *Solberg v. Inline Corp.,* 740 F.Supp. 680, 682 (D.Minn.1990); *Finnan v. L.F. Rothschild & Co.,* 726 F.Supp. 460, 462–64 (S.D.N.Y.1989). As a result, there are few published decisions which construe it. "Employer" is defined as "any business enterprise that employs ... 100 or more employees, excluding part-time employees ..." 29 U.S.C. § 2101(a)(1)(A).[18] There is no dispute that there were more than 100 employees at the Summit Hotel. Under § 2102(a), an employer is precluded from ordering a plant closing or mass layoff until sixty days after a written notice of such order is served. Section 2104(a)(1)(A) further provides:

> Any employer who orders a plant closing or mass layoff in violation of section 2102 of this title shall be liable to each aggrieved employee who suffers an employment loss as a result of such closing or layoff for ... benefits under an em-

ployee benefit plan ..., including the cost of medical expenses incurred during the employment loss which would have been covered under an employee benefit plan if the employment loss had not occurred....

*See generally Jones v. Kayser–Roth Hosiery, Inc.,* 748 F.Supp. 1292 (E.D.Tenn. 1990); *Jones v. Kayser–Roth Hosiery, Inc.,* 748 F.Supp. 1276, 1289–91 (E.D.Tenn. 1990).[19] Section 2104(a)(4) also provides:

> If an employer which has violated this chapter proves to the satisfaction of the court that the act or omission that violated this chapter was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of this chapter the court may, in its discretion, reduce the amount of the liability or penalty provided for in this section.[20]

*See generally Jones, supra,* 748 F.Supp. at 1291–92. Some suggestion of the legislative intent behind this act is set forth in § 2106, which provides in full: "It is the sense of Congress that an employer who is not required to comply with the notice requirements of section 2102 of this title should, to the extent possible, provide notice to its employees about a proposal to close a plant or permanently reduce its workforce." The Secretary of Labor was ordered, under § 2107, to promulgate "such regulations as may be necessary to carry out this chapter." [21]

---

**17.** Defendant MHM has made two additional arguments with respect to plaintiffs' claims under WARN: (1) a district court lacks authority to issue an injunction under the exclusivity provision found in 29 U.S.C. § 2104(b); and (2) MHM is entitled to the "good faith" defense found in § 2104(a)(4).

**18.** Of the few published decisions construing the WARN statute, three concern the manner in which the number of employees is calculated. *Solberg, supra,* 740 F.Supp. at 683–86; *Damron v. Rob Fork Mining Corp.,* 739 F.Supp. 341 (E.D.Ken.1990); *United Electrical, Radio & Machine Workers of America v. Maxim, Inc.,* 1990 WL 66578, at 2–4 1990 U.S.Dist. LEXIS 5988, at 3–5 (D.Mass.1990).

**19.** The court, in its discretion, may also award attorneys' fees to the prevailing party. 29 U.S.C. § 2104(a)(6). *See generally Solberg, supra,* 740 F.Supp. at 687 (denying attorneys' fees to pre-

vailing defendant, where plaintiffs' claims under WARN were not "frivolous, unreasonable, or without foundation").

**20.** *See* note 17 *supra.*

**21.** Section 2105 indicates that the rights and remedies provided under WARN "are in addition to, and not in lieu of, any other contractual or statutory rights and remedies of the employees ..." *See also* 20 C.F.R. § 639.1(g). On the other hand, § 2104(b) provides that the remedies established in this section "shall be the exclusive remedies for any violation of this chapter" and further advises that "[u]nder this chapter, a Federal court shall not have authority to enjoin a plant closing or mass layoff." This exclusivity provision does not deprive a federal court of its authority to issue a preliminary injunction under WARN. *See Local 397, Int'l Union of Electronic, Electrical, Salaried, Ma-*

These regulations, which are only ten sections long, are found at 20 C.F.R. §§ 639.1 through 639.10. The scope of these regulations is described as follows in § 639.1(b):

> These regulations establish basic definitions and rules for giving notice, implementing the provisions of WARN. The Department's objective is to establish clear principles and broad guidelines which can be applied in specific circumstances. However, the Department recognizes that Federal rulemaking cannot address the multitude of industry and company-specific situations in which advance notice will be given.

The lengthy definition section, § 639.3, gives some additional guidance in construing the term "employer":

> Under existing legal rules, independent contractors and subsidiaries which are wholly or partially owned by a parent company are treated as separate employers or as a part of the parent or contracting company depending upon the degree of their independence from the parent. Some of the factors to be considered in making this determination are (i) common ownership, (ii) common directors and/or officers, (iii) de facto exercise of control, (iv) unity of personnel policies emanating from a common source, and (v) the dependency of operations.

Section 639.3(a)(2).[22]

As to the first two factors, the parties have stipulated that MHM has no common ownership interest, general or limited partners, shareholders, officers or directors with CCELP or in the Summit Hotel. With regard to the last three factors, there is no dispute that MHM was in charge of the day-to-day operations of the hotel, such as the hiring and firing of employees, discipline of employees, processing of wages, and grievance procedures. In a different context, it is not inconceivable for MHM to be considered plaintiffs' "employer." The evidence was irrefutable, however, that the original decision to close the Summit Hotel in early October 1990 was initiated by the Colonial Realty organization and that the decision to accelerate the closing by two months to Friday, August 10, 1990 was the brainchild of Googel, Sisti, Shuch and Candelori, about which MHM had no notice until Monday, August 6, 1990. Even Holt acknowledged that it was necessary to have Colonial Realty participate in the "effects bargaining" sessions held in August and September, as it was Colonial Realty's decision which had an impact upon the hotel's employees. It is *that* decision alone which triggered plaintiffs' rights and remedies under WARN. Under the heightened standard which applies here, where plaintiffs must make "a clear showing that [they are] entitled to the relief requested," it does not appear that the liabilities under WARN should shift to MHM, merely because defendant did the "dirty work" for Colonial Realty in implementing Colonial Realty's decision.

The Court could only locate two related published decisions which address who among two possible candidates was the "employer" for purposes of WARN.[23] Both decisions, *Hotel Employees Restaurant Employees Int'l Union Local 54 v. Elsinore Shore Associates*, 724 F.Supp. 333 (D.N.J.1989) and *Finkler v. Elsinore Shore Associates*, 725 F.Supp. 828 (D.N.J. 1989), issued within eight days of one another, concern the Atlantis, a hotel and casino owned by the defendants, which in

---

chine & Furniture Workers, AFL–CIO v. Midwest Fasteners, Inc., 763 F.Supp. 78, 81 (D.N.J.1990). See note 17 supra.

**22.** This test is analogous to the "four-factor test" developed by the National Labor Relations Board in determining whether two or more related entities constitute a single entity for purposes of employee relations. The "four-factor" test is analyzed in considerable detail in Owens v. American National Red Cross, 673 F.Supp. 1156, 1158–61 (D.Conn.1987) (dismissing wrongful discharge action against defendant American

National Red Cross brought by employee of its Greater Hartford Chapter).

**23.** The Magistrate Judge located a third decision, *Holcomb v. Pilot Freight Carriers, Inc.*, 120 B.R. 35 (M.D.N.C.), Magistrate's Ruling adopted, 1990 U.S.Dist. LEXIS 14333 (M.D.N.C.1990), which concerned a "piercing the corporate veil" analysis under bankruptcy law, North Carolina law, and federal common law. No similar issue is raised here.

1985 filed a bankruptcy petition under Chapter 11 of the Bankruptcy Code. The Atlantis' financial condition continued to deteriorate and on April 7, 1989, the New Jersey Casino Control Commission ["NJCCC"] denied the defendants' application to renew their license. Six days later, on April 13, 1989, the NJCCC appointed a conservator, thus permitting the hotel and casino to operate without a license on a temporary basis. On May 16, 1989, the NJCCC decided to cease all gambling operations at the Atlantis, the employees were notified the next day, and the employees were "laid off" as of May 22, 1989. The plaintiffs then commenced actions under WARN, as to which the defendants did not deny that they were the plaintiffs' "employer" prior to April 14, 1989, the date the conservator assumed his responsibilities. 724 F.Supp. at 335; 725 F.Supp. at 830–31. The defendants argued, however, that they were discharged of their obligations under WARN once the NJCCC's conservator was appointed and that he instead was the "employer" for purposes of WARN. 724 F.Supp. at 335; 725 F.Supp. at 831.

The test the court applied was who was actually in charge of the business—if the conservator "continued the business in operation, then he filled the role of the employer for purposes of 'WARN'," whereas if the defendants "continued the business in operation and the [c]onservator simply monitored and assessed the business in consultation with the [NJCCC]," then the obligations imposed by WARN remained with the defendants. 724 F.Supp. at 335; 725 F.Supp. at 831. As the order issued by the NJCCC gave the conservator a "relatively limited role," the Court held that he "did not succeed" to the defendants' obligations under WARN. 724 F.Supp. at 335–36; 725 F.Supp. at 831–32.

Each side claims that these decisions are helpful. Plaintiffs are correct that in these two decisions, the defendants were not absolved of their responsibilities under WARN merely because the decision effectively to close the hotel and casino (by ceasing its gambling operations) was not made by them. But the issue in the *Elsinore* decisions was not choosing between the defendants and the NJCCC, the decision-maker there, but between the defendants and the conservator. The issue, in its most basic form, was "who ran the show?" Just like the analysis with respect to the five factors set forth in 20 C.F.R. § 639.3(a)(2), the literal "show stopper" here was Colonial Realty, whose principals decided in late July or early August 1990 to close the Summit Hotel as of August 10, 1990.

While the WARN statute is remedial in nature and compliance with its procedures is to be encouraged even where not required, *see* 29 U.S.C. § 2106, "... the Supreme Court has cautioned that 'where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it.' " *Finnan, supra,* 726 F.Supp. at 464 (citation omitted). Given that "[t]he notice obligations of WARN and the accompanying remedies are novel creations of Congress and represent a public policy decision to establish new legal obligations for employers," the court in *Finnan* refused to create a right to punitive damages not otherwise found in the WARN statute. *Id.* at 464–65. As defendant has pointed out, in other labor statutes, Congress specifically has defined an employer to include agency situations, such as Title VII of the Civil Rights Act (defining an employer as a "person engaged in an industry affecting commerce ... and any agent of such person ...," 42 U.S.C. § 2000e(b)), the Fair Labor Standards Act (including within the definition of employer "any person acting indirectly or directly in the interests of an employer in relation to an employee ...," 29 U.S.C. § 203(d)), and the National Labor–Management Relations Act (including within the definition of employer "any person acting as an agent of the employer, directly or indirectly ...," 29 U.S.C. § 152(2)).

For all these reasons, the Court finds that in this preliminary injunction context, plaintiffs have not sustained the burden necessary to show that defendant MHM is their "employer" for purposes of the

WARN statute.[24]

### 3. COBRA Claims

Defendant MHM similarly argues that it is not plaintiffs' "employer," nor the "plan sponsor," for purposes of COBRA.[25] While COBRA, like WARN, is relatively short statute, 29 U.S.C. §§ 1161–68, it is nonetheless quite complicated. COBRA was enacted to provide benefits which were otherwise unavailable under ERISA:

> ERISA was designed to protect private-sector employees from losing pension rights after many years of service. ERISA failed to cover workers' health-insurance benefits, however. As a result, Congress enacted COBRA to fill the gap by requiring employers who participate in group health plans to continue to provide health coverage to employees who leave work under certain statutorily prescribed circumstances. An employer who fails to comply with COBRA loses the tax deduction for expenses incurred in providing the group health plan.

*Kidder v. H & B Marine, Inc.,* 932 F.2d 347, at 349 n. 1 (5th Cir.1991).

The heart of COBRA is found in § 1161(a), which provides in full:

> The plan sponsor of each group health plan shall provide, in accordance with this part, that each qualified beneficiary who would lose coverage under the plan as a result of a qualifying event is entitled, under the plan, to elect, within the election period, continuation coverage under the plan.

The remainder of COBRA essentially explains, in considerable detail and with a number of permutations, the terminology used in this deceptively simple provision. The "qualifying event" here apparently was "[t]he termination ... of the covered employee's employment." Section 1163(2). Detailed notice provisions are found in § 1166, which impose a responsibility upon the employer to notify the plan administrator of the qualifying event within thirty days thereof (§ 1166(a)(2)) and upon the plan administrator to notify any qualified beneficiary within fourteen days thereafter (§§ 1166(a)(4)(A) & (c)). Within sixty days of either the date coverage terminates due to the qualifying event or notice by the plan administrator, whichever occurs later, § 1165(1), the employee may elect to continue coverage " ... which is identical to the coverage provided under the plan to similarly situated beneficiaries under the plan with respect to whom a qualifying event has not occurred," § 1162(1), for a specified "period of coverage," which is generally eighteen months, § 1162(2),[26] at a premium rate not to exceed 102% of the applicable rate for such period, § 1162(3). *See generally Kidder, supra,* 932 F.2d 347, at 356; *NYNEX, supra,* 898 F.2d at 888–89; *Paris v. F. Korbel & Brothers, Inc.,* 751 F.Supp. 834, 837–40 (N.D.Cal.1990); *Dehner v. Kansas City Southern Industries, Inc.,* 713 F.Supp. 1397, 1400–01 (D.Kan.1989). If both the "employer" and the "plan administrator" fail to meet their respective duties under COBRA, a court may apportion damages between the two. *See Kidder, supra,* 932 F.2d 347, at 355–356.

Under ERISA, the "plan sponsor" is defined as the "employer in the case of an employee benefit plan established or maintained by a single employer." 29 U.S.C. § 1002(16)(B)(i). The term "employer" is defined as "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan ... " 29 U.S.C. § 1002(5).[27] In its multitude of contacts

---

**24.** In light of this conclusion, there is no need to address the other two arguments made by MHM. *See* note 17 *supra.*

**25.** Plaintiffs agree that MHM is not the "plan administrator." (*See* Dkt. #45, at 39 n. 33). Under the clear language of the ASO (Jt. Exh. 18), BC & BS was the "plan administrator."

**26.** *See* note 31 *infra.*

**27.** As with WARN, *see* note 18 *supra,* most of the published decisions construing this aspect of COBRA concern an employer's attempt to be exempted from the COBRA requirements under the "small employer" exemption found in § 1161(b). *See Kidder, supra,* 932 F.2d 347, at 353; *Martinez v. Dodge Printing Centers, Inc.,* 123 B.R. 77 (D.Colo.1991), at 3–15; *Krogh v. Chamberlain,* 708 F.Supp. 1235, 1237–39 (D.Utah 1989).

with BC & BS, both in instituting the ASO plan and in its eventual termination, there is little doubt that MHM acted "indirectly in the interest of [the] employer, in relation to an employee benefit plan," and thus could be considered an "employer," and consequently a "plan sponsor," [28] for purposes of COBRA. If the "qualifying event" occurred on August 10, 1990, when the hotel was closed, then MHM satisfied its obligations under COBRA by virtue of the letter it sent to BC & BS on August 13, 1990. (Jt. Exh. 33). If so, the entity which failed to notify plaintiffs in a timely fashion would be BC & BS, which is not a party to this litigation. However, as previously mentioned, Colonial Realty continued to fund the ASO agreement throughout the month of August 1990. Thus, if the "qualifying event" was the bouncing of two checks payable to BC & BS in early September 1990, an event not specifically listed in § 1163, there is no dispute that MHM failed to provide the appropriate notification to BC & BS,[29] and BC & BS belatedly sent notices to plaintiffs in late November 1990.[30] (Jt. Exhs. 8, 29, Ps' Exhs. 1A & 1B).[31]

■ As a further complication, as stated in Section II.A.2. *supra*, plaintiffs ask the Court not to *extend* their insurance coverage, but rather to *reinstate* or *reestablish* it. In *NYNEX, supra,* in contrast, the defendant-employer was ordered to provide appropriate clarifying notice to its employees *prior* to the expiration of the insurance coverage.[32] Defendant MHM has argued that "... no effective remedy can be forged unless plaintiffs amend their complaint to add [BC & BS] so that it may be within reach of a court remedy." (Dkt. # 33, at 50). In rejecting that contention, plaintiffs claim that

> ... MHM can either enter into another agreement with [BC & BS] to recreate or replicate the insurance; it can enter into an agreement with another provider to provide the same level of benefits, or it can, as it chose to do before, self-insure. Whatever scenario it chooses, it must first provide the coverage and then provide the COBRA continuation.

(Dkt. # 45, at 43 (footnote omitted)). Plaintiffs acknowledge that they do not expect MHM to pay for these premiums, but that they simply want an opportunity to pay for the premiums themselves. (*Id.* at 43 n. 39). While the Court fully appreciates the precarious positions in which plaintiffs find themselves, through no fault of their own,

---

28. Curiously, the term "plan sponsor" is not found in COBRA in any provision other than § 1161(a).

29. As previously indicated, it was BC & BS which itself terminated the ASO agreement, so that it of all people did not need to be advised of same by MHM. There was no testimony about when and by whom MHM was informed of the demise of the insurance policy.

30. There is no need to discuss in this recommended ruling whether the notice itself, and the insurance coverage offered, complied with the COBRA requirements.

31. Although not raised by defendant, there is also a serious question as to whether plaintiffs had any right to "continuation coverage" under COBRA after September 18, 1990. Section 1162(2) provides that

> The coverage must extend for at least the period beginning on the date of the qualifying event and ending not earlier than the earliest of the following:
>
> . . . . .
>
> (C) ... The date on which coverage ceases under the plan by reason of a failure to make timely payment of any premium required un-

der the plan with respect to the qualified beneficiary.

As the Fifth Circuit noted in *Kidder, supra,* COBRA applies to employers who *participate* in group health plans, the penalty for which is the loss of a tax deduction for the expenses incurred in providing the group health plan. 1991 U.S.App. LEXIS 3558, at 2 n. 1. None of these considerations apply when the entire plan lapses for nonpayment of premiums.

32. On August 28, 1989, NYNEX notified its striking employees that it intended to terminate their medical coverage as of September 15, 1989. Under COBRA, the employees had until November 15, 1989 to elect to receive continued coverage. On October 18, 1989, plaintiff filed its complaint and motion for preliminary injunction. The hearing thereon was held on October 19, 1989 and the injunction was issued the next day. 898 F.2d at 888–90.

MHM is correct that no remedy can be fashioned against it only. While the Court may have the authority to compel a defendant to perform an affirmative act on the defendant's own accord, the Court simply lacks the power to *order* a defendant to enter into a contractual relationship with an unspecified third party outside the court's control. Given the present state of the economy, and particularly as it affects those in the insurance industry, there are no assurances that MHM will even find an insurance company willing to enter into a policy with respect to these employees. In light of the $101,215.81 debt owed to BC & BS, it would come as no surprise that BC & BS would not be enthusiastic towards reinstating the ASO policy, absent a court order specifically directed towards it.[33]

Accordingly, in light of these substantial hurdles, plaintiffs have not sustained the burden necessary for the issuance of a preliminary injunction under COBRA.

### III. CONCLUSIONS

For the reasons stated above, plaintiffs' motion for preliminary injunction is denied.[34]

*See* 28 U.S.C. § 636(b) (written objections to ruling must be filed within ten days after service of same); F.R.Civ.P. 6(a), 6(e) & 72; Rule 2 of the Local Rules for United States Magistrates, United States District Court for the District of Connecticut; *Small v. Secretary, H & HS*, 892 F.2d 15, 16 (2d Cir.1989) (failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit).

Dated at New Haven, Connecticut, this 9th day of April, 1991.

---

**33.** *See also* note 31 *supra.*

**34.** Counsel are requested to contact the Magistrate Judge's New Haven Chambers for the purpose of scheduling a status conference to discuss, *inter alia*, the filing of additional briefs with respect to defendant's motion for summary judgment. *See* note 5 *supra.*